McGreal, Appellant, *v.* Merchants Warehouse Company.

McGreal, Appellant, *v.* Pennsylvania Railroad Company.

Argued October 22, 1935.

Before KELLER, P. J., BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Albert L. Moise,* for appellant.

*S. S. Herman,* of *Herman & Harris,* for appellees.

OPINION BY KELLER, P. J., February 28, 1936:

The Pennsylvania Railroad Company owns a four-story building located at Front and Federal Streets, Philadelphia. Freight cars are delivered on sidings on the level of the first floor. There are at least three freight elevators in the building. The railroad company leased the basement and the second, third and fourth floors to Merchants Warehouse Company. No mention was made in the lease as to the care and maintenance of the elevators. The Merchants Warehouse Company subleased the third and fourth floors to Publicker Commercial Alcohol Company. This lease gave the lessee the right to use the elevators in common with the lessor and other tenants, and the lessor covenanted to keep the elevators in good order and condition. The Publicker Commercial Alcohol Company placed one of its subsidiaries, Continental Distilling Corporation in possession of the premises leased by it.

On the evening of February 9, 1934, at about 6:40 o'clock, Thomas McGreal, an employee of Continental Distilling Corporation was working on the first floor of this building, as one of a gang of about twenty men, unloading boxes of empty bottles from a freight car

and putting them on skids for the purpose of sending them by elevator No. 2 to the third and fourth floors to be filled with liquor. Other men were working for the same company at elevators No. 1 and No. 3. It was not shown that, at this time, anybody was in the building but workmen of the Continental Distilling Corporation. Elevator No. 1 was at the north end of the building; No. 3 at the south end; and No. 2 in between. The toilet was located northeast of elevator No. 1 and about twenty-five feet away; a line extended south from the door of the toilet would run about fifteen feet east of the east face of the elevator. Continental Distilling Corporation was working day and night with four six-hour shifts and was using all three elevators. No operators were furnished by the railroad company or Merchants Warehouse Company to run the elevators. Every tenant using them operated them by its own workmen.

McGreal and two of his fellow workmen had gone to the toilet. On coming out to go back to work, Carney walked first followed by White and McGreal. McGreal had only worked since two o'clock that day and was not very familiar with the premises. As they came out of the toilet, their boss, Farrell, called to them from the west side of the building to "come here." The building, or at least the first floor, was somewhat dimly lighted and as White and McGreal were walking southward past elevator No. 1, White saw McGreal fall or plunge into the elevator shaft, striking the bottom of the pit in the basement and receiving injuries from which he died. The elevator, at the time, was up at the third floor and the safety gate which automatically fell into place and guarded the shaft when the elevator was not at the floor, had been tied up with a rope or wire, which prevented its automatic action. There was no evidence in the case as to when this was done—beyond the fact that at 5:55 P. M. that day the gate was in

proper position—or who did it, but at the time of the accident nobody but employees of Continental Distilling Corporation were working there. Merchants Warehouse Company and Continental Distilling Corporation had offices on the first floor and had the right to use that floor in going to and from the floors above and in loading and unloading the elevators, and also in the use of the toilet.

Margaret McGreal, the deceased employee's mother, a resident of the Irish Free State, brought four separate actions in trepass against (1) Pennsylvania Railroad Company, (2) Merchants Warehouse Company, (3) Publicker Commercial Alcohol Company and (4) Continental Distilling Corporation. They were tried together. The trial judge directed verdicts in favor of Continental Distilling Corporation and Publicker Commercial Alcohol Company because any rights against the former, the deceased man's employer, would have to be under, and subject to, the provisions of the Workmen's Compensation Act of 1915, P. L. 736; and as to the latter, because it had not been shown to have ever been in actual possession and occupancy of any portion of the building. The plaintiff took no appeal from this action. The cases against the other two defendants were submitted to the jury which rendered a verdict for $1,500 against each of them. The court in banc entered judgments non obstante veredicto in their favor because, as to Merchants Warehouse Co. there was no evidence that there was anything mechanically wrong with this elevator No. 1, or that it was not in good condition; and as to Pennsylvania Railroad Company because no negligence had been shown on its part in connection with the tying up of the safety gate, which caused the accident.

The plaintiff appealed.

The plaintiff, in attempting to make out her case, called witnesses who testified that the safety gate at

No. 1 elevator was down in place and automatically working as late as 5:55 o'clock P. M. of the day of the accident, or only forty-five minutes before McGreal fell down the shaft. Philip A. Larney, a witness called by plaintiff testified that he had operated elevator No. 1 for Continental Distilling Corporation on February 9, 1934 from 7:47 A. M. to 4 o'clock P. M. and that the gate was down when he left; and Charles H. Alwine, also a witness called by plaintiff, testified that he operated elevator No. 1 for Continental Distilling Corporation on that day from 4 o'clock P. M. to 5:55 o'clock P. M. and that the safety gate was not tied up during that period.

The plaintiff also called as a witness a city inspector named Leahy, who testified that when he left the building, after inspecting the elevators on February 2, 1934, the safety gates were all released and working automatically and the elevators were in good mechanical order. He also testified, from his recollection, that he had found the safety gates or some of them either blocked up with a stick or tied up with rope and had released them and, he said, he had sent a report containing a note that "All gates must operate freely and must not stick or be tied up," to one Wm. T. McCouch acting for the Pennsylvania Railroad Company. McCouch, called as a witness by *plaintiff*, denied having received a report of any such inspection made between February 2 and February 9, 1934. The explanation may consist in the fact that the report presented in evidence and forming part of the record is dated April 2, 1934—"4/2/34". In any event, plaintiff's evidence was to the effect that the elevator was in good mechanical order and condition, with safety gate down and working automatically, when the inspector left the building on February 2, 1934, and there is no proof in the case that the condition of the elevator

was otherwise up to 5:55 o'clock P. M. of the day of the accident.

Appellant takes the position that because the Pennsylvania Railroad Company was the owner of the building and in control of the first floor—to the extent that it had not leased it to any tenant for its exclusive use—it was bound to see that the elevators were in safe condition, with safety gates working and automatically descending when the elevator was not at that floor; and that a similar duty devolved on Merchants Warehouse Company by reason of its sublease of the third and fourth floors, with the covenant that it would keep the elevators in good order and condition.

It must be remembered, however, that these were not passenger elevators, and no duty devolved on either Pennsylvania Railroad Company or Merchants Warehouse Company to operate them or furnish attendants to do so. These elevators were strictly freight elevators, which were not to be used for the carriage of employees except when necessary to do so in taking up a load, and each tenant supplied his own operator. The landlord furnished the appliance, but the tenant operated and made use of it. Hence the owner or the sub-landlord could not be held liable for any improper or negligent use of the appliance by the sub-tenant's operators or workmen, unless knowledge of such misuse was brought home to them or it had existed sufficiently long to amount to constructive notice. The case is not different in principle, as respects the duties and responsibilities of the owner and landlord, from those incident to a staircase to the second, third and fourth floors. The landlord would be bound to keep the stairway structurally safe and free from defects which would render it unsafe for passage. But if without notice to or knowledge of the landlord, a tenant, or one of his employees, should negligently leave some temporary obstruction on the stairway over which one of the workmen fell and

injured himself, the landlord would not be responsible for the resulting injury unless the obstruction was there so long that the landlord ought to have known of it, and hence had constructive notice of it. The tenant, or the workman, responsible for the obstruction, would otherwise, alone be liable.

So, in this case, Continental Distilling Corporation was the agency operating the elevators, and its workmen were responsible for tying up the safety gates and putting them out of working order until released; and were it not for the provisions of the Workmen's Compensation Law it would be responsible in damages for this injury.

In the circumstances here present there was no absolute duty resting on the Pennsylvania Railroad Company or Merchants Warehouse Company making them, or either of them, responsible for the negligent operation of this elevator by the employees of Continental Distilling Corporation while engaged on the latter's business, unless, at least, notice of such negligent operation was brought home to them, or the condition had existed so long that notice to them could be presumed.

As to the lighting, there is nothing in the testimony that makes the Pennsylvania Railroad Company responsible for the lighting of this floor, when the Continental Distilling Corporation was using it, after usual hours in all-night work; or that it had notice of any defect in the lighting, if it existed that evening. The evidence of the plaintiff was highly contradictory. There were some lights there. They were sufficient to permit plaintiff's witness, White, to enter and read the figures on his check list at elevator No. 2, seventy-nine feet away. The No. 1 elevator could be seen by persons coming out of the toilet. White testified that he was walking beside McGreal and saw him fall or plunge into the shaft. He could see his arms and legs while falling. If it was pitch dark, as appellant now argues, because one of

her witnesses used that expression, the deceased employee was guilty of contributory negligence in walking in such darkness without being able to see where he was going: Modony v. Megdal, 318 Pa. 273, 178 A. 395; Murray v. Earl, 282 Pa. 517, 128 A. 436.

The appellant has cited a large number of authorities, which would be applicable if a different state of facts existed. They relate to the duty resting on an owner operating an elevator to those being carried upon it, or on an owner in charge and control of the appliance causing the injury; or to permanent defects in condition as distinguished from temporary dangers in operation caused by the negligence of the injured man's fellow workmen; to the doctrine res ipsa loquitur, and the 'presumption' that the deceased used due care, etc., etc. They have no application to the facts of this case. The plaintiff herself proved that McGreal's fellow employees were in sole charge and operation of this freight elevator; that it was in good order and condition, except that, apparently to facilitate the job of loading and unloading, somebody had tied up this safety gate. The *plaintiff's* proof was that the safety gate was released and in good working condition when Inspector Leahy left the building on February 2, 1934, a week before; and that it was in proper position when Larney quit work at 4 o'clock of the day of the accident, and was not tied up during the time Alwine operated it from 4:00 to 5:55 P. M. of February 9. Under the rule so strongly insisted upon by appellant—"A state of facts proved to have existed at a given time will be presumed to continue in absence of evidence to the contrary"— that condition is presumed to have existed and continued from the time Inspector Leahy left on February 2, 1934 down to 5:55 o'clock P. M. of February 9, 1934, when Alwine stopped running the elevator. How long before 6:40 P. M. on February 9, 1934, some one connected with Continental Distilling Corporation tied up

the gate does not appear, but under the evidence of plaintiff's own witnesses it could not have been more than forty-five minutes—not long enough to put the Pennsylvania Railroad Company or Merchants Warehouse Company on constructive notice; especially so, since it occurred after ordinary business hours and at a time when nobody was in the building but employees of Continental Distilling Corporation.

The assignments of error are overruled and the judgments are affirmed.

No. 329 October Term, 1935.   Judgment affirmed.

No. 330 October Term, 1935.   Judgment affirmed.