## Carter, Appellant, *v.* United Novelty and Premium Co.

Argued November 23, 1956. Before STERN, C. J., JONES, BELL, MUSMANNO and ARNOLD, JJ.

*Milford J. Meyer,* with him *Norman H. Abrahamson, Busser & Bendiner,* and *Meyer, Lasch, Hankin & Poul,* for appellant.

*John J. McDevitt, 3rd,* for appellees.

OPINION BY MR. CHIEF JUSTICE JONES, May 27, 1957:

On the morning of January 17, 1953, Arthur Lee Lane was fatally injured in an elevator accident in a business building at 425 Market Street, Philadelphia. His mother, Nettie Lane Carter, as administratrix of his estate, instituted survival and wrongful death actions for damages against the owner of the building, United Novelty & Premium Co. The owner of the building, which was four stories in height, utilized the first floor as a sales room and the third and fourth floors for storage. The second floor was leased to and in the possession of Levinthal Bros., Inc., the deceased's employer, which company the defendant-owner brought upon the record as an additional defendant. At trial the jury returned verdicts for the plaintiff against both defendants jointly in the sum of $15,000 in the survival action and $2,500 in the wrongful death action. The original defendant filed motions for a new trial and for judgments n.o.v. while the additional defendant moved only for judgments n.o.v. The motion for a new trial was withdrawn at bar, and, after argument, the court en banc granted the n.o.v. motions of both defendants and entered judgments in their favor. The plaintiff brings this appeal from the judgment for the original defendant.

The accident which caused Lane's death was unwitnessed. Consequently, the plaintiff's case rests necessarily upon circumstantial evidence. The sole question raised by this appeal is as to the sufficiency of the evidence adduced at trial to carry the case to the jury on the question of liability.

Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff, as the jury's verdicts require, it appears that, on the

morning of the fatal accident, Lane had been working with Sidney Levinthal, a representative of the lessee company, bringing freight from the first floor of the building to the second floor by means of an elevator. It was about twenty minutes before the accident was discovered when Levinthal had first missed Lane. The latter's stepfather, who was employed in a parking lot across the street from the first floor outside entrance to the elevator, testified that Lane had visited him about the time just indicated. When Levinthal went to look for Lane he found his body caught and crushed between the elevator car and the second floor gate at the third floor landing with his legs dangling in the elevator shaft. His head, which was facing toward the interior of the elevator car, and shoulders were above the floor of the car with his arms resting on the car floor. He was pronounced dead upon arrival at the hospital to which he was immediately removed after his body had been extricated by a rescue unit of the Philadelphia Fire Department.

The car of the elevator was so constructed as to admit of access thereto from two sides and so could be directly entered from the street outside, as well as from within the building, when the elevator was at the ground floor. The open side of the elevator toward the exterior wall of the building was protected by a folding gate which was equipped with an electric interlock —a device which automatically barred operation of the car unless the gate was closed. The side of the elevator car from which access to the various floors of the building could be had was open but the opening was guarded at each floor by vertically rising counterbalanced wooden slatted gates which operated up and down on slides located within the shaft. These gates were equipped with electromechanical interlocks so designed mechanically as to insure against a gate's being raised

unless the floor of the adjacent elevator car was within six inches of the building floor and, in any event, would electrically prevent or stop movement of the car, regardless of where it might be in the shaft, if a gate should be opened or left open on any floor.

Since the deceased was crushed between the floor of the elevator and the second floor gate up at the third floor landing, it is admitted, as indeed it must be, that the accident could not have happened had the interlock on the second floor gate been operating properly. This is self-evident from the fact that while the second floor gate, which was raised to the third floor landing, was obviously open, the crushing force of the elevator car was then being applied to the deceased's body whereas had the interlock on the second floor gate been functioning, as it should have been, the elevator could not have moved for a greater range than six inches above and below the second floor. So much is conceded by all parties to the record.

The defendant's failure to maintain the interlock properly constitutes the negligence alleged as the cause of the death of the plaintiff's decedent. In its complaint against the additional defendant, the defendant-owner alleged that it was the negligence of the tenant, Levinthal Bros., Inc., in rendering the interlock inoperative that caused the fatal injury to the deceased. And, in its answer to the plaintiff's complaint, the original defendant admitted its ownership of the building, its own occupancy of a part of the building and averred that, by the terms of its lease to the additional defendant, all tenants and occupiers of the building had the right in common to the use of the freight elevator. The rule as to the extent of the owner's liability in such circumstances was stated in *Sloan v. Hirsch*, 283 Pa. 230, 233, 128 A. 831, as follows: " 'Where premises are let to several tenants, each occupying dif-

ferent portions, but all enjoying or using certain portions in common, such as [elevators] . . . the landlord is held to be in control, and owes, not only to his tenants, but to those lawfully on the premises as the servants . . . of the tenants the duty to exercise reasonable care and diligence to keep such parts in safe condition, and for failure to do this he is liable to such servants . . . injured in consequence of his negligence. . . .' " See, also, Annotation, 19 A.L.R. 2d 272.

The plaintiff's evidence established that the interlock at the second floor gate had been "plugged", i.e., rendered inoperative by the insertion of some foreign substance between the contacts of the electric switch on at least two occasions prior to the accident in suit. Thus, on October 3, 1952, in the course of the regular semi-annual official inspection of the elevator and, again on January 6, 1953 (just eleven days before the accident), upon a re-inspection, the inspector found the interlock "plugged". Both times he removed the "plugs" and, following the October 3rd inspection, made a formal report of the dangerous condition to the Department of Labor and Industry which, in turn, notified the defendant-owner of the situation. The inspector also notified an officer of the defendant company of the existence of the "plugs" in the interlock. The manager of the additional defendant's business testified that both he and members of his company had "plugged" the interlock device at different times. The decedent had never operated the elevator alone nor was he permitted to do so, and it did not appear that he knew how to "plug" the interlock. It was further established that employees of the defendant company used the elevator frequently to transport materials from the first floor sales room to the storage rooms on the third and fourth floors, and vice versa, and that, if the second floor gate were left open and the addi-

tional defendant's premises closed, no one could use the elevator if the interlock was in proper working order. However, the condition of the interlock immediately prior to the accident was not shown. Incidentally, the trial court, on the defendant's objection, excluded plaintiff's interrogation of a witness as to whether the defendant's employees had engaged in "plugging" the interlock. But, with the possible error in that ruling, we are not now concerned; the question here is whether the testimony which was actually received in evidence was sufficient to take the case to the jury.

The appellee contends, however, and the court below adopted the view, that the negligence charged to the defendants in respect of the non-functioning of the interlock at the second floor elevator gate was not the proximate cause of the injury to the deceased inasmuch as it was not shown to be a "substantial" as well as an "actual" factor in producing the harm for which the suit was brought. As support for this proposition, the court below cites *Slakoff v. Foulke*, 323 Pa. 352, 357, 186 A. 79, and Restatement, Torts, §431(a), while the appellee cites only the *Slakoff* case. The position thus taken by the appellee is somewhat confused, involving, as it does, a commingling of the questions as to the degree of certainty of proof of negligence required and whether the negligence shown was the proximate cause of the injury. The comment in the Section of the Restatement, Torts, cit. supra, contains the following,—"In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent. . . . The negligence must also be a substantial factor as well as an actual factor in bringing about the plaintiff's harm. The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it

as a cause, using that word in the popular sense in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred." It could hardly be said, as a matter of law, of the negligence here charged that reasonable men would not regard it as the cause of the injury. The question then becomes simply one of certainty of proof of causative negligence.

In the *Slakoff* case, supra, which involved a suit for damages for the death of a young man crushed by an elevator under circumstances somewhat similar to the instant case, this court affirmed a judgment of compulsory nonsuit entered by the trial court because of the plaintiff's failure to prove that the negligence charged was the proximate cause of the harm inflicted. There is an important distinction, however, between the two cases. In the *Slakoff* case the actionable negligence alleged was the failure to maintain a locking device the purpose of which was to stop the elevator at a certain level and to insure against its being moved at the call of someone on another floor after the device had been set by the person using the elevator. The plaintiff failed to prove either that the device had been set or that the elevator had been put in motion by someone at another floor. It did not appear, therefore, with sufficient certainty that it was the negligence charged which caused the injury. Had it been shown that the device was set and that subsequently the elevator was moved without releasing the device, then, the negligence charged could have been found to have been the proximate cause of the injury.

It is, of course, true that "evidence is insufficient to warrant recovery if it fails to describe, picture or visualize what actually happened sufficiently to enable

the fact-finding tribunal reasonably to conclude that the defendant was guilty of negligence and that his negligence was the proximate cause of the accident. A verdict cannot be supported on the basis of mere speculation or conjecture. Proof of negligence may be furnished by the circumstances themselves and it is not essential to have eye-witness testimony, but where the circumstantial evidence is offered because direct proof is not available it must provide as the only reasonable inference the conclusion that the accident was caused by the negligence of the defendant": *Ebersole v. Beistline*, 368 Pa. 12, 16-17, 82 A. 2d 11; compare *Wilbert v. Pittsburgh Consolidation Coal Company*, 385 Pa. 149, 155, 122 A. 2d 406, and *Foley v. The Pittsburgh-Des Moines Company*, 363 Pa. 1, 25, 68 A. 2d 517. Here the only reasonable inference to be deduced from the indisputable physical facts is that the deceased met his death because of the non-functioning of what should have been an automatic interlock in obedience to duly promulgated regulations of the Department of Labor and Industry. The evidence does not give rise to a possible multiplicity of causes any one of which might have produced the accident. That being so, it was not incumbent on the plaintiff to show the course of events relative to the deceased immediately preceding the happening of the accident. In death, he is attended by factual presumption that he exercised due care in the circumstances for his own safety: *Morin v. Kreidt*, 310 Pa. 90, 97, 164 A. 799. The only additional proof required, therefore, is as to who was responsible for the non-functioning of the interlock at the time of the injury to the plaintiff's decedent.

As already stated, it is conceded all round that the accident could not possibly have happened had the interlock been functioning properly. And, from the evidence, to which reference has been made, the jury could

infer that the additional defendant had, as a matter of common practice, rendered the interlock inoperative and that the defendant owner was aware of this. The course of "plugging" the interlock having been established, the jury was warranted in finding the reason for the non-functioning of the interlock at the time of the accident was that it had again been "plugged". There is nothing in the case to even suggest any other cause for the failure of the elevator to stop when the second floor gate was raised; and the defendants have not advanced any other possible cause for the failure of the interlock: cf. *Wilbert v. Pittsburgh Consolidation Coal Co.,* supra. The defendant company, as appellee here, argues that there is a complete lack of proof as to how long the interlock had been defective, and relies on the presumption that a condition once shown to exist will be presumed to continue to exist until the contrary is established. However, what was shown was a course of conduct by the additional defendant known to the defendant which, in violation of its duty to the deceased, it did nothing to abate. In that situation, the precise point of time when the interlock had been rendered inoperative became immaterial. Compare, *Goldstein v. Philadelphia School District,* 329 Pa. 71, 72, 196 A. 863, and *McGreal v. Merchants Warehouse Company,* 121 Pa. Superior Ct. 336, 341, 342, 183 A. 356.

Nor is the plaintiff to be penalized arbitrarily for her inability to show all of the circumstances of the accident. What was said by this Court in *Tucker v. P. C. C. & St. L. Railway Co.,* 227 Pa. 66, 68, 69, 75 A. 991, in such circumstances is peculiarly apposite: "No one witnessed the occurrence, and, therefore, no one can testify how it did actually happen. The case is not very peculiar in this respect. Accidents in which life is lost not infrequently occur unwitnessed. Such

fact in itself does not operate to protect one whose negligence can be shown from the general situation and circumstances to have been the operative cause. When these are such as to satisfy reasonable and well-balanced minds that the accident resulted from the negligence of the party charged, liability attaches." Bearing in mind that a lack of care for his own safety is not to be imputed to the deceased, it cannot be said that reasonable and well-balanced minds could not ascribe the harm to the appellees' negligence. See *Ferry v. Philadelphia Rapid Transit Company,* 232 Pa. 403, 408, 81 A. 426. It was therefore error for the court below to enter judgment for the defendants n.o.v.

Judgment reversed and record remanded with directions that judgments be entered on the verdicts for the plaintiff against the defendants jointly.

Mr. Justice BELL dissents.