31 N.J. Super. 105 (1954)
105 A.2d 918
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DOMINICK DANTONIO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Middlesex County Court, Criminal Division.
Decided May 27, 1954.
*106 Mr. James T. Kirk, Deputy Attorney-General, attorney for the State.
Mr. Walter S. Anderson, attorney for the defendant-appellant.
Mr. Donald S. Bowie, Jr., attorney for Ward J. Herbert, general counsel for the New Jersey State Turnpike Authority.
MORRIS, J.C.C.
This is an appeal from the Municipal Court of the Borough of Milltown. It is here for trial de novo.
On February 2, 1954 Dominick Dantonio was operating a motor bus owned by the Quaker City Bus Company north on the New Jersey Turnpike. At about 6:40 P.M. at a point on said turnpike about three miles south of interchange No. 9, Dantonio was stopped and issued a summons charging him with a violation of N.J.S.A. 27:23-29, Regulation 1, speeding at 66 miles per hour, six miles per hour over the legal limit. The speeding charge was predicated on the reading of an electric speedmeter reading (commonly known as radar). Dantonio was tried in the Municipal Court of Milltown and found guilty.
At the time the bus was stopped and the summons issued, Trooper Armstrong, the arresting officer, was requested by the defendant to sign the chart of a tachograph, a mechanical speed recording device installed in the bus.
At the trial it was testified that Troopers Trpisovsky, Armstrong and Trainor were members of a radar team on *107 the New Jersey Turnpike. They had worked together as a radar team for approximately one year. Their duty was to set up the radar equipment along various points on the New Jersey Turnpike to check the speed of motor vehicles operating on said turnpike and to apprehend violators exceeding the speed limit of 60 miles per hour. On February 2, 1954, the day in question, the team was operating in the Borough of Milltown. The duties of the various members of the team on the day in question were as follows: Trooper Trpisovsky was operating the radar equipment, while Troopers Armstrong and Trainor were the intercepting officers stationed about a quarter of a mile north of the location of the radar equipment. It was the duty of Troopers Armstrong and Trainor to stop and apprehend motorists who exceeded the turnpike speed limits. Communication between the radar operator and the intercepting officers was maintained by radio.
Trooper Trpisovsky, the radar operator, testified in detail as to the equipment, the method of setting the equipment up for operation and the testing of same for accuracy. His testimony, and the testimony of Dr. Kopper, a radar and electronics expert, showed that the radar equipment was in a box that was placed on the rear of a station wagon. The radar box was placed facing oncoming traffic. The radar box consists of two antennas, one a sending or transmitting antenna, and one a receiving antenna. The receiving antenna is connected to an electric speedmeter and to a graph machine which graph machine makes a written record of each car passing within the scope of the radar equipment. The operating area of the equipment is several hundred feet, depending upon the height of the equipment and the angle on which it is placed along the road. When the power supply is connected, the machine is ready for testing and operation.
The testing of the equipment consists of zeroing the calibrating of the electrical and mechanical equipment, so that each piece of equipment is set exactly alike and records the speed of oncoming cars alike. The radar equipment is then *108 connected to the power supply and the electric tubes heated and tested until ready for operation. Before the actual operation is commenced, State Police patrol cars are run through the operation area of the radar machine at varying speeds, which speeds are checked by radio communication against the speedometer of the police car and the electric speedmeter and graph machine of the radar equipment. If all speed recording devices record the same, radar operations commence.
Actual operation of the radar equipment consists of sending a wave or ray of radio energy down the roadway on the sending or transmitting antenna which wave is reflected off an oncoming car back to the receiver antenna on the station wagon. The sending wave is sent out on one frequency, the deflected or received wave comes back on a different and higher frequency which is translated into miles per hour by the electric speedmeter which measures the difference in the frequencies of the transmitted wave and the received wave. A written recording is made at the same time on the graph machine. The radar operator then identifies and describes the oncoming vehicle and informs the intercepting officers by radio communication of any speeding violations. He also notes on the graph a description of the car and its registration number.
The Quaker City Bus was equipped with a tachograph. A tachograph is a combination of a clock speedometer, odometer and recording mechanism intended to produce a record on a chart of a vehicle speed in miles per hour, miles travelled, and a record of whether the engine of the vehicle is idling while the vehicle is stopped. All of these combined records are plotted on a chart against time, indicating the time of any movement or stop of the vehicle. The chart is driven by a spring wound clock. The speed recording portion of the tachograph is driven by the speedometer cable which is driven from the transmission connected directly to the rear wheels of the bus. It is a mechanical speedometer and not a magnetic speedometer, as most indicating speedometers are. The contention of Dantonio, the appellant, is *109 that at no time during such trip did his speedometer indicate that he was going over 60 miles per hour, and that the chart in the tachograph, signed by Trooper Armstrong, shows a speed above 60 miles per hour.
The question thus presented and to be decided is whether, considering the above basic facts together with the supporting evidence introduced by the State and by the defendant, the State has established the guilt of the defendant beyond a reasonable doubt.
Defendant contends: (1) the trial court permitted hearsay testimony to be given by the officers in relation to tests made of the radar devices' accuracy, and (2) the trial court permitted testimony to be given concerning the accuracy of the radar device by one who was not qualified as an expert.
The contention of the defendant, with reference to the first objection, is that when the radar equipment is being set up for operation and is being tested, by running the State Police patrol car through the radar area at designated speeds, the fact that the radar operator and the patrol car driver are in radio communication with each other with reference to the speed of the patrol car engaging in such test constitutes hearsay testimony. The court is unable to agree with the defendant in this premise. The patrol car operator radios ahead that he is travelling at a designated speed as he is about to enter the radar scope. The radar operator watches his electric speedmeter and graph machine and observes the patrol car in question as it passes his station wagon. If the speedometer of the patrol car, the electric speedmeter and the graph of the radar equipment check accurately, what has occurred is the patrol car officer has established the fact that his patrol car has passed through the radar area at a designated speed, while the radar operator establishes that at the time and place in question a car came through the radar scope at a designated speed, which is identified as a police patrol car as it passed the station wagon where the radar equipment is installed. Each officer testifies as to independent facts. The patrol car officer testifies as a fact to the speed of the patrol car as shown by his speedometer. *110 The radar operator testifies as to the recording of the electric speedmeter and the graph machine and of his own visual observation of the car making the test. Radio communication is merely incidental. The fact of the speed of the patrol car and the recording of the electric speedmeter, the graph machine, the observation of the radar operator remain the same without benefit of radio communication. The modus operandi was, and is, a daily part of the setting up of the radar equipment for operation. This was the method used on February 2, 1954 and the method of operation shown to Dr. Kopper, the radar and electronic expert, the day he made his test and observation of the State Police radar equipment and its method of operating same.
The second contention of the defendant, that the trial court permitted testimony to be given concerning the accuracy of the radar device by one who was not qualified as an expert, was overcome at the trial de novo by the testimony of Dr. John M. Kopper, a qualified electrical engineer with a Bachelor and Doctor of Engineering degree in electrical engineering. Dr. Kopper also testified to several years of research and development work, part of which had been in the development of instruments. It was Dr. Kopper's opinion that if the radar equipment was properly and carefully set up, in the manner described by Trooper Trpisovsky on February 2, 1954, it would give a reading of speed which was in the accuracy limits of the meter, two miles per hour plus or minus. On cross-examination Dr. Kopper testified that if any defects in the radar equipment were to develop, such as defective tubes or condensers, or low voltage in the battery, it would all tend to decrease the number of electrons emitted from the heat surfaces within the tubes and give a lower and less than true reading. All defects in the equipment resolve in favor of the motorist.
In addition to the defendant, Mr. Dantonio, the defense had as a witness a tachograph expert, Mr. William S. Paine. Mr. Paine testified in detail as to the construction and operation of the tachograph. His reading of the tachograph chart showed that the driver of the bus had, according to the *111 chart, slightly exceeded the turnpike speed limit at one point in the trip by going 61 miles per hour. Mr. Paine's experience consisted of working in the engineering department with the designer of the tachograph and checking with actual factory production as it went along. Mr. Paine has testified on three previous occasions with reference to the operation of the tachograph.
Mr. Norman Moyer, a defense witness, is employed by the Quaker City Bus Company as a safety engineer. He patrols the route of operation of the bus company and is in charge of safety and safe operation of buses, and in charge of the tachographs. Mr. Moyer, after receiving the tachograph chart of the bus in question and the summons issued to the defendant, communicated with Lieutenant Probit of the Turnpike State Police to request permission to recheck the speed of the bus through the radar equipment. Permission was granted and on February 4, 1954 the recheck was made with the same bus, while the bus was going south at Carteret, N.J. The speed of the bus, as shown on its speedometer, was 60 miles per hour. The speed on the electric speedmeter and on the graph machine was 60 miles per hour.
Other witnesses produced on behalf of the defendant were Mr. Leighton P. Baker, superintendent of maintenance for the Quaker City Bus Company, and John Fork, salesman for the Wagner Electric Company, sales distributors of the tachograph, who did not give such testimony as to materially affect the thinking of the court.
In rebuttal the State produced Edmund A. Ricker, a traffic engineer employed by the New Jersey Turnpike Authority, who testified that the mileage from the toll booth at interchange No. 4 to mile post 80 1/2, the point where the radar equipment was set up on February 2, 1954 and the place where the defendant Dantonio went through the radar area, is 46 1/4 miles. The defendant testified the mileage was "about 42 or 43 miles." This is a difference of at least 3 1/4 miles of variance. To have travelled 46 1/4 miles in approximately 40 minutes, or thereabouts, would have required a *112 constant speed of 66 miles per hour under the most favorable conditions from interchange No. 4 to the point of apprehension.
In view of the recheck run made on February 4, 1954, above described, where all speed measuring devices were alike, defendant contends that the tachograph chart reading is correct and that the electric speedmeter and graph reading is incorrect. This does not necessarily follow. It is not the function of this court to determine whether radar or tachograph is the more accurate measuring device, and the court does not propose to do this. However, in the light of recently reported decisions dealing specifically with the operation of radar measuring devices, as in the case of State v. Moffitt, 100 A.2d 778, 779 (Del. Super. Ct. 1953), the court finds in the case at bar that the radar equipment was properly set up and functioning accurately and properly and the reading of the electric speedmeter to be accurate. This court is in full agreement with that portion of the Moffitt case which states "The mere fact that the test in the present case was made by a person not skilled in electronics is not of sufficient import to render the Speed Meter inadmissible in evidence."
In the case of People v. Offermann, 204 Misc. 769, 125 N.Y.S.2d 179, 185 (Sup. Ct. 1953), the appellate court reversed the decision of the lower court because the people relied entirely on the reading of the speedmeter and because of an abuse of discretion by the lower court in not allowing an adjournment to permit the production of an electronic expert.
Both of the above cases are distinguishable from the case at bar in that there was no written record of the violation. In each of the above cited cases the evidence of speed was obtained solely from the reading of the electric speedmeter. In the instant case a written record of the speed of the bus was produced and introduced into evidence as a part of the speeding proof.
In order to avoid lengthy litigation and appeals, the recommendation of the court in the concluding paragraphs of *113 the opinion in the case of the People v. Offermann is very timely and pertinent.
"The legislature in its wisdom might see fit to declare that the reading of an electrical timing device similar to the one here may be admitted in evidence as prima facie evidence of the speed of the automobile of an accused, after such device has been certified as accurate by the authority designated by the legislature. By such legislation, the People will be relieved of the burden of proving the accuracy of the electrical timing device upon each trial and by expert testimony. The traveling public will be protected against convictions based upon the reading of an unproven and possibly inaccurate device, and of equal importance, the rules of evidence will not be violated."
I therefore determine that on February 2, 1954 the radar equipment of the New Jersey Turnpike State Police was properly set up and tested for accuracy and was functioning properly and was a correct recorder of speed. I further determine, in view of all of the testimony, that the defendant Dantonio was exceeding the speed limit of the New Jersey Turnpike and was travelling at 66 miles per hour, as charged. I find that the state has established the guilt of the defendant beyond a reasonable doubt, and therefore find the defendant guilty of the violation charged.