5-1633                                           323 S. W. 2d 424

Opinion delivered April 13, 1959.

[Rehearing denied May 18, 1959]

*Guy H. Jones,* for appellant.

*George F. Hartje, Owens, McHaney, Lofton & Mc-Haney,* for appellee.

Paul Ward, Associate Justice. On November 23, 1951, about 7:00 p.m., Richard Neil Bell, the husband of appellant, lost his life as the result of a collision between a car which he was driving and a 5-ton truck owned by The Kroger Company and being driven at the time by Windfrey Sory.

Suit was brought by the deceased's widow to recover damages based on the following allegations of negligence:

The defendant Windfrey Sory failed to yield the right-of-way to the said Richard Neil Bell, deceased; the defendant Windfrey Sory carelessly, recklessly and neg-

ligently operated and controlled said five-ton Kroger truck in such a manner as to cause Richard Neil Bell, deceased, to bring and place himself in a position of deadly peril from which he could not escape and where he could not avoid said collision; the defendant Windfrey Sory failed to keep a proper lookout for other persons who may or could have been driving upon said highway at said time and place; the defendant Windfrey Sory operated said Kroger truck at said time and place in such a manner as to create an emergency for the said Richard Neil Bell, deceased, wherein the said Richard Neil Bell, deceased, could not avoid said collision; the defendant Windfrey Sory did operate, drive and maintain said five-ton Kroger truck upon said highway at said time and place without any lights and without proper lights after night time and in darkness and carelessly, recklessly and negligently failed to turn on the lights or sufficient lights on said truck until the said Richard Neil Bell, deceased, had driven his automobile to a point and to a position on said highway where said collision was inevitable and unavoidable; the defendant Windfrey Sory at said time and place recklessly, carelessly and negligently failed to turn on the lights on said Kroger truck in time to warn the said Richard Neil Bell, deceased, of the presence of said Kroger truck.

A trial resulted in a jury verdict in favor of appellant's estate for $700 but nothing for the widow and children. This appeal is based on the alleged error of the trial court in allowing the introduction in evidence of an instrument known as a Tactograph, together with the testimony relating thereto. Generally speaking, a Tactograph is an instrument containing a clock with a paper dial attached which is fastened onto the motor of a truck in such manner that a needle will indicate on the paper dial the speed of the truck at any given time and also each truck stop and the time thereof.

In taking this appeal appellant designated only the pleadings and that portion of the testimony relating to the Tactograph. Appellees have not designated or brought forward any other portions of the testimony.

The issue presented by this appeal is a novel one in this state, and our research has revealed very little help from other jurisdictions. But after careful consideration we have concluded that the cause must be reversed for either one of two reasons which we hereafter discuss.

*No sufficient proof of accuracy.* Only two witnesses testified as to the operation of the Tactograph. One was Arthur L. Estes who was in charge of transportation for the Kroger Company, and the other was Windfrey Sory who was driving the truck at the time of the accident. Estes had only general knowledge of the use of the instrument but of his own knowledge he knew nothing of its accuracy. This was clearly revealed by his own testimony.

Q. "Mr. Estes, have you ever tested one of these on a drive yourself?"

A. "I have never tested one, no, sir."

Q. "And you have no personal knowledge of their accuracy, have you?"

A. "No, sir, I don't have any personal knowledge of their accuracy."

Mr. Sory was asked if "he ever actually checked one of these graphs against a trip" and he replied that he had and that at one time it was part of his job to do so, and he found them accurate. It is not shown, however, that he had checked this particular one and found it accurate. The contrary is strongly indicated by the record. The Tactograph in question was placed on the truck in 1948 and had never been repaired, although Sory admitted such instruments develop defects. He did state that if a defect occurred the instrument would not work. The record further indicates that this particular instrument was not accurate. Estes testified:

Q. "So that your Tactograph indicates on this graph that this truck did not stop at anytime from 4:30-4:35 in the afternoon until 7:00 o'clock, at the time of the accident?"

A. "That is right."

But Sory, the driver of the truck, stated that he stopped at Russellville about 5:25, at Atkins about 5:45, also at Morrilton, and at Conway about 6:37. He said the accident happened at 6:55.

In view of the above state of the record and because we are here dealing with a novel concept of evidence, we think the court should have refused to allow the introduction of the Tactograph. In the case of *State* v. *Dantonio* (N. J.) 105 A 2d page 918 the court required a much higher degree of proof than is shown by this record.

*The testimony was not relevant or competent.* It cannot be contended that the Tactograph could possibly reveal any evidence conceivably pertinent to this case except the speed of the truck at the time of the accident. Yet there is nothing in the record to show that "speed" was relied on as an element of negligence. All the allegations of negligence relied on by appellant are set out above. It might be argued that "speed" was *implied* in the second paragraph if it were not for the fact that the specific acts of negligence are carefully defined in the other paragraphs.

The record does not show that "speed" was relied on in any of the testimony, and we cannot presume that it was. The last sentence of Section 12, Act 555 of 1953 reads:

"Where the record has been abbreviated, by agreement or without objection from opposing parties, no presumption shall be indulged that the findings of the trial court are supported by any matter omitted from the record."

*Sufficiency of Objections.* The record discloses appellant indicated her objections on five different occasions. On page 26, when the first effort was made to introduce the Tactograph, she objected; on page 27 she objected to it on the ground of incompetency; on the same page she renewed her exceptions; on page 30 where the graph was finally introduced she saved her exceptions, and; on page 38 she asked that all testimony be stricken because the accuracy of the Tactograph had not been proven.

Although appellant might have given more specific reasons for objecting in each instance, we think they all clearly indicated the action which she desired the court to take, *i.e.*, exclude the Tactograph and all testimony relative thereto from the record. Section 21 of said Act 555 says that "it is sufficient that a party . . . makes known to the court the action which he desires the court to take . . . ."

For the errors indicated, the judgment of the trial court is reversed and the cause is remanded.

Reversed and remanded.

HOLT and McFADDIN, JJ., dissent.

J. SEABORN HOLT, J., dissenting. I do not agree with the majority-view. A Kroger Company truck, driven by appellee, Sory, collided with a car driven by Richard Bell on Highway 65 in Faulkner County at about 7:00 P. M. on November 23, 1951, resulting in the death of Bell. Bell's widow as administratrix sued to recover damages growing out of her husband's death. She claimed damages for herself and next of kin and also damages for the benefit of the estate of her deceased husband. A jury trial resulted in a verdict in favor of defendants (appellees here) on appellant's claim for herself and next of kin, but the jury allowed appellant $700.00 damages for the benefit of the estate.

Appellant brings this appeal seeking a reversal of the judgment on the grounds that the court erred in admitting in evidence a mechanical device called a "tacograph" together with a graph or recording made by this machine. She says, "All of the testimony, evidence, and the exhibit, pertaining to the so-called, 'Tactograph' (Also called 'Tacometer', 'Tacograph', 'Tactometer' and 'Tachograph') is incompetent, immaterial, and irrelevant, and should have been excluded as misleading to the issues before the jury and as prejudicial to the rights of appellant. The instrument, device, or appliance, most commonly referred to in this cause as a 'Tactograph', has not been proved as accepted and usual by custom, practice and usage, and expert or special knowledge would be neces-

sary for the formation of an intelligent opinion, or for presenting such testimony or exhibit to a jury. This 'device', commonly unknown, was introduced and presented to the jury in this cause by witnesses without expert knowledge of the accuracy, the functioning or correctness of said 'device'.''

I do not agree with these contentions.

Mr. Estes who is in charge of transportation for the Kroger Company testified in effect that a tacograph is a machine in general use by truck operators, that Kroger has had it on all of their trucks throughout the United States since 1947 up to the present, that it is placed in the cab of a truck, connected to the speedometer and operates both off the speedometer and through the medium of a clock contained in the instrument itself and records the movements of the vehicle. A graph is placed in the machine which is activated when the truck starts and continues in activation until the graph is removed from the device. While the machine is in action certain information is recorded on the graph as the truck moves on its designated route and when the trip is completed, the recording is removed from the tacograph, signed by the driver (Sory here) and filed with the one in charge of transportation, in this instance, Estes.

Appellee Sory, driver of the Kroger truck at the time of the mishap, testified as to the use of the tacograph and the recording which it made. He testified that the graph, or recording, introduced as an exhibit to Mr. Estes' testimony was put in the truck in question at 10:39 A. M., that if opened by the driver and the chart removed this would be reflected on the chart itself by a cut on the outer edge of the graph. While the speedometer of the truck is working and the clock is running, the tacograph is accurate, that it cannot be tampered with or stopped unless the speedometer cable is disconnected or the clock broken which fact would be revealed on the graph itself. Sory went over the trip stop by stop in testifying as to the accuracy of the tacograph. It appears undisputed that the collision in question occurred at about 7 P. M. The graph,

or recording, shows that immediately prior to the collision the truck was being operated at a speed varying between 42 to 45 miles per hour and that following the collision it then descended to zero. The graph further shows that the truck was continually in motion from 6:37 P. M. until 6:55 P. M., the time of the mishap. He further testified that he could take the recording and show exactly when he slowed down or came to a stop, that there was a stop in Russellville indicated at about 5:25 P. M., one at Atkins at about 5:45 P. M., one at Morrilton and one at Conway. That the graph shows the distance from the stop in Conway to the scene of the accident which is exactly 10 miles, that he stopped at a stoplight in Conway at about 6:37 P. M. and that the graph shows that the collision happened at 6:55 P. M. That he drove this 10 miles to the scene of the accident from Conway in approximately 20 minutes which is the exact time. The graph shows his approximate speed from Conway to the scene of the accident was 45 miles per hour and that his speed did not reach 47 miles per hour. By the use of this graph the supervisor (Mr. Estes here) is able to determine whether the truck stopped at places intended, to determine the speed of the truck at any given time and whether it stayed within the allowed printed speeds on the graph, 20 to 70 miles per hour.

The record reflects that the trial court did not permit the introduction of the tacograph, and the graph or recording, as conclusive evidence of the facts in regard to the operation of the truck in question but in this connection instructed the jury as follows:

"I will admit it. The weight—the jury will understand that this is a mechanical device. It will be admitted for whatever light it may shed—that is a question for the jury. The court holds that it is admissible. The weight, if any, to be afforded is a question for the jury. Such weight as you see proper or reject it as you see proper."

As indicated, I am convinced, that there was no error in introducing this mechanical device and the recording in question which tend to corroborate the testimony of witnesses Estes and Sory.

Wigmore (Vol. II Sec. 665a P783), in discussing the use of scientific instruments, apparatus, formulas, and calculating tables says this: "Scientific instruments, Formulas, etc. The use of scientific instruments, apparatus, formulas, and calculating tables, involves to some extent a dependence on the statements of other persons, even of anonymous observers. Yet it is not feasible for the professional man to test every instrument himself; furthermore he finds that practically the standard methods are sufficiently to be trusted. Thus, the use of a vacuum-ray machine may give correct knowledge, though the user may neither have seen the object with his own eyes nor have made the calculations and adjustments on which the machine's trustworthiness depends. The adequacy of knowledge thus gained is recognized for a variety of standard instruments. In some instances the calculating tables or statistical results are admitted directly, under an exception to the Hearsay rule (post, Sec. 1706)."

In the case of *Whitton* v. *Central of Georgia Ry. Co.,* 89 Ga. App. 304, 79 S. E. 2d 331, that court had for consideration whether a tape recording of the speed of a locomotive was properly introduced in evidence and in holding that it was proper evidence used this language: "Joe M. White testified that, after the report of the accident on September 1, 1952, he was instructed to take the tape from the speedometer of Diesel locomotive number 137, the engine involved in the collision. The tape is kept in the engine, in front of the engineer's seat, and the tape covered the speed at which the engine was running at all times. _____ the purpose of the tape was to determine the speed the engineer makes in his run; that it does so by an electric device which is hooked onto the wheel and which turns the tape in the speedometer; that it has a pencil point on it to determine how fast the locomotive is running; that from the tape the speed of the engine can be determined at any particular point. He took the tape to Mr. Watson.

"(3) R. E. Watson testified that the locomotive's speed as recorded was about 35 miles per hour at the

325th mile post, and then decreased uniformly to a stop before reaching the 324th mile post, which point represented the crossing at which the collision occurred, according to Watson's testimony. Watson's testimony was in explanation of the tape, and the fact that he did not know how the recording machine operated was no ground of objection to such evidence. Joe M. White had previously testified as to the method of the machine's operation, and stated that the speed of the engine could be determined at any particular point from the record made. .............................................. The court did not err in admitting the speed recorder tape over the objection made thereto.''

As indicated here the tacograph recording tended to corroborate and substantiate the testimony of Sory and Estes. These witnesses were familiar with the operation of the machine through experience with it over the years. While this machine was not infallible, I think the court correctly admitted it to the jury for whatever value it might be to the jury in determining the question of negligence. I would affirm.