Benner *v.* Weaver, Appellant.

Argued November 20, 1958. Before Jones, C. J., Bell, Musmanno, Jones, Cohen and Bok, JJ.

504

*William S. Bailey*, with him *Samuel Gubin*, *Horace W. Vought*, and *Bailey & Rupp*, for appellant.

*Robert McK. Glass*, with him *Richard Henry Klein*, *Leonard R. Apfelbaum*, and *Harry L. Wilcox*, for appellees.

OPINION BY MR. JUSTICE MUSMANNO, January 12, 1959:

George J. Benner was killed when a tractor-trailer which he was operating for his employer, Hall's Motor Transit Company, collided with a truck owned and operated by George E. Weaver. Mae M. Benner, administratrix of his estate, filed an action in trespass against Weaver under the Wrongful Death Act and the Survival Act. Weaver, in turn, entered a suit against Hall's Motor Transit Company for damages sustained by his truck. In this suit, Hall's Motor filed a counterclaim against Weaver for damages done to the tractor-trailer. The two cases were consolidated for trial and resulted in verdicts in favor of the plaintiff-administratrix in both the Survival and Death actions and a verdict in favor of Hall's Motor for damages done to its vehicle.

Weaver filed motions for judgment n.o.v. in both cases. They were refused by the court below and this appeal followed.

On May 4, 1955, between 4:00 and 4:30 o'clock in the morning, George Benner was proceeding northwardly on U. S. Highway 11-15 in a tractor-trailer, whose overall length was 44 feet. The trailer had a

huge box car body carrying 20,000 pounds of steel plates. The vehicles themselves weighed 10,000 pounds each, thus giving to the entire gargantuan combination a total of 40,000 pounds. While Benner was moving northwardly on the indicated highway, George E. Weaver was driving an empty Ford truck weighing 10,000 pounds and about 18 feet long in the opposite direction on the same thoroughfare. When they arrived at a point some eight miles south of Selingsgrove, Synder County, the truck and the tractor-trailer collided, causing the death of Benner. The doctor who examined Benner's body testified that it revealed fractures to ribs on the left side of the chest, to the left thigh, the left leg below the knee and the right arm. The neck was broken. The plaintiff argues, from the concentration of fractures on the left side of the decedent's body, that the violence which caused his death overwhelmed him on his left side. This is an important item to consider in reconstructing the accident in order to determine liability, since there were no eyewitnesses to the tragic mishap.

It is the contention of the defendant that, in the absence of eyewitnesses, any conclusion as to how the cars came together can only be a guess or conjecture and therefore cannot sustain a verdict. It is true that this Court said in *Ebersole v. Beistline*, 368 Pa. 12, that: "The evidence is insufficient to warrant recovery if it fails to describe, picture or visualize what actually happened sufficiently to enable the fact-finding tribunal reasonably to conclude that the defendant was guilty of negligence and that his negligence was the proximate cause of the accident. A verdict cannot be supported on the basis of mere speculation or conjecture."

But this does not mean that responsibility for an accident can only be fixed by the testimony of eyewit-

nesses. As recently as 1957, we approved in *Carter v. United Novelty and Premium Co.,* 389 Pa. 198, what was said in *Tucker v. P. C. C. & St. L. Railway Co.,* 227 Pa. 66: " 'Accidents in which life is lost not infrequently occur unwitnessed. Such fact in itself does not operate to protect one whose negligence can be shown from the general situation and circumstances to have been the operative cause. When these are such as to satisfy reasonable and well-balanced minds that the accident resulted from the negligence of the party charged, liability attaches.' "

What were the circumstances in this case? That the Weaver truck and the Hall's tractor-trailer collided cannot be disputed. Weaver, who was called by the plaintiff in cross-examination, admitted the collision, but he could not or would not tell just how it occurred. Three truck drivers who came upon the scene immediately after the accident testified that they asked Weaver what happened. To two of them he replied: "I don't know" and to the third he gave no answer at all.

Both the vehicles were found on their own respective sides of the highway. This indubitably indicates that one of them, after the impact on its wrong side of the road, drove or bounced back to its right side of the road. The highway is made up of three lanes, each 11 feet wide. The Hall trailer was found in the northbound lane parallel to the edge of the road; its tractor was jack-knifed toward the center lane, its front extending into the center lane from one to one and one-half feet. From the rear of the dual wheels of the trailer, skid marks extended for a distance of 12 feet, writing in the dust of the road the message that the wheels, after being braked, slid for that distance. There was also a skid mark to the left of the left front tractor wheel. Walter Barber, who saw the mark, said: "There was a skid mark or rubber mark from the left front

wheel on the side slide. What I mean, it appeared to me the left front wheel on point of impact had been pulled or jerked sharply to the left leaving a short skid mark."

With regard to the tractor, Barber said that the left front corner of the cab was "completely gone," and that the left front wheel was driven back under the chassis for a distance of two feet. He testified also that he found glass and pieces of metal around the tractor, as well as glass in both the northbound and center lanes. He recollected that there was no debris in the southbound lane. Benner, the driver of the tractor-trailer, was found lying in the middle lane of the highway with his head near the left front wheel of the tractor.

In the violence of the impact, the body of the Weaver truck was torn loose from the chassis and landed over the bank on the west side of the southbound lane. The chassis came to rest from 300 to 600 feet south of the tractor-trailer, athwart the southbound lane, the front facing the east.

Speed, which more often than not is the principal villain dominating the headlong plot of grim and bloody encounters on the highway, was not missing from this tragic performance. Weaver testified that at the time of the accident he was driving at from 35 to 40 miles per hour. The fact that he traveled some 600 feet after the impact, plus the many other factors involved in the collision as delineated by the evidence on the road, which will later be discussed seriatim, all speak convincingly and practically conclusively of a much higher velocity.

The speed of the Hall unit, on the contrary, was a moderate one and was recorded indisputably. The unit carried a device known as a tachograph which momently registered the speed of the tractor-trailer as it proceeded over the highway. The chart on the tacho-

508

graph spelled out the speed of the tractor-trailer as 34 miles per hour at 4:22½ a.m., 37 miles per hour at 4:24 a.m., followed by a "slight slow down" immediately before the impact.

As already stated, the trailer was transporting steel plates. D. S. McDonald, testifying as to these plates, said: "The trailer was loaded with steel plates and at the time of the wreck they moved ahead and pushed the front of the trailer out at the bottom. There was damage to one and one-half sheets on the left side of the trailer looking from the rear. Those sheets were pushed toward the rear of the trailer, pushed and crushed toward the rear of the trailer."

The fact that most of the load moved forward only shows, of course, that the vehicle stopped suddenly. Every person who has ever ridden in an automobile knows what happens when the driver slams on his brakes and the passenger's forehead rudely kisses the windshield. But the fact that, despite this general lunging forward of the steel plates, 1½ sheets on the left side were pushed to the rear can only mean, according to the law of physics, that a propelling force moved them in that direction while the bulk moved in another direction. What was that propelling force? It was the same force which sheared off the left front cover of the tractor, it was the same power which pushed the left front wheel of the tractor back two feet, and the same violence which fractured a series of bones in the left side of Benner's body. What could be that invading might? It would be sheer perversity to say that it was anything other than the Ford truck. In *Weshalek v. Weshalek*, 383 Pa. 153, we said: "Events do not discourse only through the tongue of man. The twisted fragments of wrecked cars, the heavy, strained tire-marks in the dust and dirt of the road, and the position of lifeless bodies on the high-

way frequently tell the story of a tragic accident with more convincing realism than witnesses whose memory may have been affected by the shock and excitement of the violent event as well as by human frailties which often chip at the edge of faithful recollection and leave something less than impeccable truth."

The convincing realism in this case is practically conclusive. There can be no other reasonable explanation for the accident than that Weaver drove his truck over to his wrong side of the road, hit Benner's tractor on its left side, and then suddenly veered back to the southbound, or his own lane. In the fierceness of the encounter, Weaver's left front wheel was torn loose, destroying the truck's guidability, and, as a consequence, it finally came to rest from 300 to 600 feet beyond the tractor-trailer, half turned around and straddling the southbound lane.

We cannot tell from these events how and why Weaver left his own lane and got over to Benner's lane. Had he fallen asleep at the wheel? Had he partaken of food or beverage which had dulled his perceptions? These questions cannot be answered except from Weaver's lips which he has chosen to seal, but it is not necessary, for the disposition of our case, that that secret be unlocked. When a driver is on the wrong side of his road, there follows an ipso facto presumption of negligence against him, unless he can satisfactorily explain why he would be where maximum peril resides for himself and all those who legitimately are pursuing their course on their own side of the road.

Weaver had an opportunity to explain how and why his vehicle and that of Benner's got together in a dance of death. He said that he did not know. He was not hurt by the collision. He got out of his vehicle and spoke with the truck drivers who had now appeared following the crash. When questioned on the whyness

of the wreck, he answered enigmatically. Neither did he offer any further enlightenment at the trial. Nor did he claim that temporary amnesia had blotted out what was written on the retina of his consciousness, unless, of course, he was actually asleep when he allowed the guiding wheels of his death-dealing truck to cross the fatal line of demarcation between his lane of travel and that of others.

The truck weighed 10,000 pounds as against the tractor-trailer's combined weight of 40,000 pounds. When a heavy object and a light object collide, the heavy object is more likely to hold its ground than its light antagonist, which deduction would establish that Benner at the time of the accident was on his own side of the road where his tractor-trailer was found after the impact. And if Benner was on his own side of the road, Weaver had to be on his wrong side of the road.

In weighing the probabilities as to the cause for the fatal wreck on the night of May 3, 1955, we must place in the scales of deliberation on the plaintiff's side the presumption that George Benner, the dead driver of the tractor-trailer, was exercising due care. The jewel of life is the ultimate in secular treasure, beyond all calculation as to utility and richness. The law accordingly says that no sane person gives up this jewel voluntarily. Hence, it is assumed, in the presence of a dead body, that the spirit which has departed, fought to retain its corporeal cloak of terrestrial happiness. And from this accepted truism there results the rule of law that, in the absence of evidence to contradict it, a decedent exercised the weapons of his senses and the strength of his body, fighting to avoid the fate which overwhelmed him. The defendant in this case produced no evidence to controvert the application of the rule of due care.

And then, supporting that presumption of due care, there was introduced evidence that Benner was a driver of 10½ years' experience, that he was of 41 years of age, and of healthy, physical vigor. There was testimony also that his motor tractor enjoyed good mechanical health. Four hours prior to the accident, it had been checked for gas, oil, water, lights, brakes and general running efficiency, and was pronounced in good operating condition.

While incidents wholly disassociated from the crucial event which is the subject of litigation have but little probative value in a reconstruction of the controverted episode, it is still an item not to be entirely discarded as insignificant, insofar as Weaver's negligence is concerned, to note that from the time he left his starting point until the moment his truck struck the mortal blow at Benner, he had traveled only 38 miles—in a period of 4½ hours. He offered no explanation at the trial as to what had detained him on the way, even as he advanced no explanation as to why he had crashed into a behemoth of the road, which no one could fail to perceive even if only half-awake and only in partial possession of his wits and reflexes.

When a person who emerges alive from a wreck cannot or will not tell what he was doing just before the wreck, and all the immutable laws of physics and mechanics point a long straight finger of mathematically proved guilt at him as the author of the wreck, it would be a wrecking of the incontrovertible principles of logic and ratiocination to deny the unchallenged proposition that he, and he alone, caused the wreck.

The trial was conducted by able lawyers on both sides, it was presided over by an experienced and able judge, the jury was intelligent and understanding, the charge of the court was clear and enlightening and followed established authority, no trial errors appear in

the record. To upset a verdict which reached its destination riding on vehicles of such solid ballast and expert guidance, would be in the nature of wrecking established law on the subject of negligence. It would, moreover, be a tinkering with the most important law in the whole universal mechanical scheme of the universe—that of cause and effect.

There is nothing in this case which suggests the need for so appalling a molestation. The judgment is affirmed.

Mr. Chief Justice JONES concurs in the result.