494 P.2d 61

Adolfo VILLEGAS and Teresa Villegas,
his wife, Appellants,

v.

Jimmy E. BRYSON et al., Appellees.

No. 1 CA–CIV 1417.

Court of Appeals of Arizona,
Division 1.

March 2, 1972.

Rehearing Denied March 29, 1972.

Review Denied May 31, 1972.

States, Meyer & Vucichevich, by Dale L. States, Phoenix, for appellants.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Thomas A. McGuire, Phoenix, for appellees.

KRUCKER, Chief Judge.

The deceased, Adolpho Villegas, was the husband of Teresa Villegas, the appellant in the wrongful death action. On November 1, 1968, Adolpho Villegas was driving toward the Mt. Shadows Golf Course where he was employed. Shortly before 6:00 a. m. his auto was involved in a collision with a truck and trailer owned by defendant Arizona Tank Lines, Inc., and driven by defendant Jimmy E. Bryson. Following the accident, the deceased remained in a semi-comatose condition until his death on March 17, 1969.

Two material questions of fact were presented for the jury: (1) whether the traffic signal favored the plaintiff-deceased or the defendant truck driver, and (2) whether defendant's speed at the time of the collision was in excess of the 40 miles per hour posted speed limit.

The jury rendered a verdict for the defendants and a judgment was entered in their favor. Plaintiff's motion for a new trial was denied and this appeal followed.

The questions presented to this court on appeal are: (1) Did the trial court err in admitting evidence and testimony pertaining to the tachograph in defendant's truck? (2) Was there credible evidence of contributory negligence by the deceased to support the jury's verdict?

## TACHOGRAPH

Authority for the admissibility of a tachograph and related testimony is very limited and the issue has never been decided by an Arizona appellate court. An article in the Wayne Law Review offers a summary of the law in this area.[1] A tachograph is there defined as a "precision registering or recording tachometer (a device for indicating speed of rotation) or speedometer." Such instruments have been used on trains and commercial trucks and buses for a number of years. The author of this article concluded from his analysis of the law that: (1) a tachograph recording of the speed of a vehicle is competent evidence of speed if it is properly identified and authenticated, (2) such recordings may be used as substantive evidence of speed and in corroboration or contradiction of other evidence of speed, and (3) the tachograph recording must be identified and duly authenticated which should include proof that

the particular instrument relied upon was in good working order and accurate at the time the recording was made.

Tachographs and related testimony have been introduced and found informative in various lawsuits,[2] but the admissibility of such a tachograph has seldom been questioned on appeal. Udall cites Bell v. Kroger, Co., *infra*, for the proposition that a tachograph will be admitted if a sufficient foundation is proven.[3] While the Arkansas Supreme Court in Bell v. Kroger Co., 230 Ark. 384, 323 S.W.2d 424 (1959), did reject the use of the "tactograph" there, it suggested that, had speed been an issue and a proper foundation of accuracy laid for the instrument, the "tactograph" could be competent evidence. In *Bell* no sufficient proof of the accuracy of that particular instrument had been offered and the testimony was not relevant since speed was not relied on as an element of negligence.

A tachograph tape was held properly admitted at trial in Whitton v. Central of Georgia Ry. Co., 89 Ga.App. 304, 79 S.E.2d 331 (1953). There the court held that the speed tape had been properly admitted where testimony had been offered as to how the machine operated and the accuracy thereof and the opposing counsel had not cross-examined in this regard.

The Texas court in Union Transports, Inc. v. Braun, 318 S.W.2d 927 (Tex.Civ. App.1958) found the failure to offer a "tacometer" tape to be of some persuasion. The court observed that the appellant trucking company had failed to produce the "tacometer" from the truck or to explain its failure to produce same and concluded that this failure "tends to strengthen the probative force of other evidence bearing upon the question of the speed of the truck,

1. Conrad, The Tachograph as Evidence of Speed, 8 Wayne L.Rev. 287 (1962).

2. Thompson v. Chicago and Eastern Illinois Railroad Co., 32 Ill.App.2d 397, 178 N.E. 2d 151 (1961); Johnson v. New York Central Railroad Co., 357 Mich. 40, 97 N.W.2d 769 (1959); Cooper v. Hoeglund, 221 Minn. 446, 22 N.W.2d 450 (1946); Gulf Colorado and Santa Fe Railroad Co.

v. Parmer, 389 S.W.2d 558 (Tex.1965): Texas and N. O. Railroad Co. v. Lemke 365 S.W.2d 148 (Tex.1963); Union Transports, Inc. v. Braun, 318 S.W.2d 927 (Tex.Civ.App.1958); Biggers v. Continental Bus System, Inc., 157 Tex. 351, 303 S.W.2d 359 (1957).

3. Udall, Arizona Law of Evidence, § 135, Note 26.5.

and is of itself of some probative force on the question."

■ In the case *sub judice*, appellant doesn't question the general acceptance of the tachograph as competent evidence of speed, but contends that all evidence related to the tachograph· should have been stricken because there was no proper showing of ·the accuracy of this particular instrument. This court agrees that the law and common sense require that the accuracy of the ·particular tachograph which made the chart being offered in evidence, be shown. In reviewing the record to determine what testimony was offered regarding the accuracy of this instrument, we keep in mind that the admission of evidence is largely within the discretion of the trial court and its ruling should not be disturbed unless there is shown an abuse of discretion. Throop v. F. E. Young and Co., 94 Ariz. 146, 382 P.2d 560 (1963); Henderson v. Breesman, 77 Ariz. 256, 269 P.2d 1059 (1954); Gallagher v. Viking Supply Corp., 3 Ariz.App. 55, 411 P.2d 814 (1966).

■ The transcript includes testimony by Charles L. Culbertson, a shop foreman of Arizona Tank Lines, that he removed the truck from the scene of the accident. Following necessary repairs, on November 5 Culbertson, at the request of his employer, ran a test of the truck's speedometer system. A "counter" was attached to the speedometer cable which checked it at 987 revolutions per mile out of a possible 1000, i. e., 98.7% accurate.

Robert James Blancarte, Western Region Tachograph manager for Sangamo Electric Co., with 24 years experience with tachographs, explained the operation of the tachograph and his method of checking the accuracy of this particular tachograph:

"A By the system check, the ratio check of 987 would establish the accuracy of the odometer and on mileage recording stylus and by taking a previous period of time checking the miles traveled against the time factor and comparing it with the speed registering stylus we

are able to prove the accuracy of the chart.

Q What period of time did you check previous to the accident for this purpose?

A Ten minutes period of time.

Q Was that a day before the accident or two days?

A Yes, it was.

Q It was a day before?

A Yes.

\* \* \* \* \* \*

What we do, we take a period of time and we have hash marks at 10 minute intervals along the chart.

We take a period of 10 minutes and count as the stylus comes up and back down, we count 4 and 5, will be 9 miles. Then what we do we compare it with the speed of the' vehicle. I should put another 60 up here. See, the speed of the stylus comes up and is traveling along a constant speed. We pick an area where the speed of the vehicle is as constant as possible with little variation. In this 10 minute period if 9 miles are traveled for an hour, it will be %₀ or 54 miles. Now, you check the speed stylus and it should be at 54 miles an hour. If you had just 5 miles of travel, 4½, 4½ miles, then the speed should be in here at 27 miles per hour. This is what we call our proof line."

From this check Blancarte concluded:

"A My opinion is the tachograph was within normal limits of accuracy on the day of the accident."

From this testimony we think the trial court could have reasonably concluded that the tachograph chart was accurate and therefore properly admitted it in evidence.

In the overall record of evidence, the tachograph was just one factor of several considered by the jury in deciding the issue of the truck's speed. Other factors included Jimmy Bryson's estimate of his speed at 40 m. p. h., an estimate of the truck's speed at 35 to 40 m. p. h. by Mr. Moreland, the disinterested witness, and varying esti-

mates (from 40 to 52 m. p. h.) of the truck's speed by several accident reconstructionists using the skid marks and drag coefficients to arrive at probable speeds. We think it entirely reasonable that the trial court permitted the consideration of the tachograph chart and testimony for whatever weight the jury might want to give it.

## CREDIBLE EVIDENCE TO SUPPORT THE JURY'S VERDICT

Appellant's second contention is that there was no credible evidence of contributory negligence by the deceased which would support a verdict for the defendants.

 It is true that if there were no evidence to support the verdict the trial court should vacate the judgment and order a new trial. Heaton v. Waters, 8 Ariz. App. 256, 445 P.2d 458 (1968); Meyer v. Ricklick, 1 Ariz.App. 494, 405 P.2d 285, vacated on other grounds at 99 Ariz. 355, 409 P.2d 280 (1965); Rule 59(a) (8), Ariz. Rules of Civil Procedure, 16 A.R.S. However, in reviewing the record we find evidence from which the jury could reasonably have concluded that the deceased had been contributorily negligent in running a red light.

Jimmy Bryson, the driver of the truck, testified that the light changed to green for him when he was 600 feet back from the intersection. John Wesley Moreland, the disinterested witness, also testified that the light was green for defendant's truck and red for the deceased's automobile.

A contrary conclusion might have been drawn from the testimony of Derwyn Severy, a research engineer called by the plaintiff. Regarding the nature and operation of the semi-automatic light at the McDowell and 76th Street intersection, Severy identified the light as a "demand actuated system" with an induction loop in the street on 76th Street. He testified that, if no traffic had crossed the intersection prior to deceased's automobile passing over the loop, deceased's car should have actuated the system, causing the light for 76th Street traffic to change to green for at least five seconds.

The question was properly submitted to the jury and the jury apparently chose to believe the testimony of Bryson and Moreland rather than guess at the workings of the signal light system at this particular moment.

We find reasonable support in the evidence for the jury's verdict.

Affirmed.

HATHAWAY and HOWARD, JJ., concur.

Note: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120, subsec. E.