MURRAY HEISERMAN ET AL. *v.* THE BALTIMORE & ANNAPOLIS RAILROAD COMPANY ET AL.

[No. 694, September Term, 1971.]

*Decided July 5, 1972.*

658

[black redaction box]

[black redaction box]

[black redaction box]

The cause was argued before MURPHY, C. J., and POWERS and CARTER, JJ.

*Richard T. Rombro,* with whom were *Wartzman, Rombro, Rudd & Omansky* on the brief, for appellants.

*Donald L. Merriman,* with whom were *Merriman, Crowther & Merriman* on the brief, for appellees.

POWERS, J., delivered the opinion of the Court.

Members of the Knights of Pythias in Baltimore chartered two buses of The Baltimore & Annapolis Railroad Company to take members and their families on a four day vacation at a resort known as Grossinger's, in upper New York State. The group left Baltimore early on July 27, 1969. For at least some of the party the trip came to an abrupt end that afternoon when one of the buses, nearing its destination, left the highway, went into a ditch, and fell over onto its left side.

Eight separate damage suits filed in the Circuit Court for Baltimore County by passengers against the bus company and its driver are involved in this appeal, taken from judgments entered after a verdict in favor of the defendants in a consolidated trial before a jury and Judge Kenneth C. Proctor. The trial dealt only with liability as a separate issue, as authorized by Maryland Rule 501.[1] The only question raised in this appeal is whether the

---

* Note: *Certiorari* denied, Court of Appeals of Maryland, September 19, 1972.

1. Plaintiffs in each case had filed a "Motion For Separate Trial of Issue of Law", invoking Maryland Rule 502. Defendants consented, and the motions were granted. We note that trial before a jury of the separate issue of liability, or more properly, negligence (See *Peroti v. Williams,* 258 Md. 663, 267 A. 2d 114), under Rule 501, is not the same as a separate decision by a judge of an issue of law, under Rule 502. However, no question of procedure is raised in this appeal.

trial judge erred when he declined to instruct the jury that *res ipsa loquitur* was applicable to this case.

Appellants' evidence consisted of the depositions of Robert Fink and Roger LeBarron, two New York State Troopers who investigated the accident; the testimony of John C. Reynolds, who interpreted the tachograph disc taken from the bus; and excerpts from a pretrial deposition given by Fred John Nemcek, the bus driver. Appellees' evidence consisted of the testimony of Nemcek.

The accident occurred at about 2:30 P.M. on State Highway 17, in Sullivan County, New York. The road ran east and west. There were two lanes for westbound traffic and three lanes for eastbound traffic, divided by a mall four or five feet wide. Each lane was 12 feet wide. There was a shoulder of three or four feet on the north side. The road was straight and downhill for westbound traffic for about 1,500 feet to the accident scene. The posted speed limit was 65 miles per hour. The bus was travelling west. It had been raining, and the road was wet.

When the troopers arrived the bus was lying on its side, off the paved portion of the road, and partially off the shoulder.

Trooper Fink, the first to arrive, said:

> "Then I located the driver, Mr. Nemcek, and I asked him what happened, and he stated that as he came over the hill there was an accident further down the road and traffic was stopping and he applied the brakes, the bus started to skid; he knew he couldn't stop it so he headed for the shoulder and he couldn't stop the bus on the shoulder either. He continued on and rolled over."

The trooper said he observed the highway "as far as I could see up the road", approximately 500 feet, and did not observe any particular oil spots on the road. The bus driver did not mention to Trooper Fink the presence of any other vehicle which caused him to veer the steering

wheel of the bus. There had been a two car accident about 500 feet west of the scene of the bus accident, and the cars involved in that accident were still there. There was no traffic moving in the immediate area when the trooper arrived. On cross examination Trooper Fink again related what the bus driver had told him, in these words:

> "He said as he came over the crest of the hill the traffic in front of him started to stop and he applied the brakes, the bus started to skid, he knew he couldn't get it stopped so he headed for the shoulder in an attempt to get it stopped there and he couldn't get it stopped there either, and then he pointed to the bus and said, 'This is what happened.'"

Trooper Fink did not make an accident report because he was relieved at the scene by Trooper LeBarron.

Upon his arrival Trooper LeBarron made similar general observations, and prepared an accident report. He made an inspection of the highway east of the accident scene, and did not see any oil spots. Mr. Nemcek did not tell him that there were any other vehicles which interfered with his operation of the bus. He related Mr. Nemcek's explanation of the accident as follows:

> "He told me that as he came over the hill he observed both lanes of traffic ahead stopped. He applied his brakes and the bus began to skid in a clockwise motion. He released the brakes, the bus continued to skid and he reapplied the brakes and continued in a clockwise motion and rolled to its left side."

Mr. Reynolds, chief dispatcher for a different bus company, testified to a number of years of experience in reading tachograph discs which are in standard use in buses. He examined the tachograph disc taken from the bus involved in this case. He explained that the device mechanically records speed with relation to time. We understand from his explanation that one set of markings

shows time in intervals of five minutes, and the other shows speed in multiples of 10 miles per hour. The line actually recorded while the bus is in motion may be interpolated both as to time and speed.

Reading the tachograph disc which was placed in evidence, the witness said:

> "At 2 p.m. it recorded from 52 miles per hour up to 60 miles per hour. And after 2:10 p.m., it recorded approximately 43 miles per hour, and then to 60 miles per hour, to 52 miles per hour, to 68 miles per hour, to 34 miles per hour, to 32 miles per hour, to 55 miles per hour, then suddenly to 22 miles per hour with a slight hesitation to zero."

He placed the time of the zero reading at somewhere between 2:20 and 2:25 p.m., probably 2:23 or 2:24. As to the reading of 55 miles per hour, he said it was at 2:22 or 2:23, and was for only a matter of seconds, after which the reading showed 22, and then zero. The drop from 68 to 34 was at about 2:10, some 12 to 14 minutes before the end of the recording. He further said that the recording shows the speed at which the back wheels are revolving, "even though the bus was not going as fast".

Appellants, as plaintiffs below, offered as part of their case, the following excerpts from Mr. Nemcek's deposition:

> "Q: As you came over the crest of the hill and you first noticed the vehicles in front of you, were they in a stopped position?
>
> A: Yes.
>
> Q: And how far were they in front of you?
>
> A: Oh, I guess when I noticed them, it was about approximately five bus lengths or so.
>
> Q: That was the first time you noticed they were stopped?
>
> A: No, that I noticed they were stopped—traf-

fic; I thought they were moving, moving slowly, but when I approached them, they were stopped.

Q: Well, let me ask you this: where was your bus when you first saw the vehicles in front of you?

A: You mean in distance behind them?

Q: Yes.

A: Well, like I said, it could have been about five [bus lengths], about possibly 200 feet."

\* \* \*

"Q: Okay, now what distance did you travel from the time you were able to see over the crest of that hill and start down, to the time you applied your brakes?

A: After I come over the top of the hill when I came down a short distance, I noticed traffic up ahead of me had stopped.

Q: What do you mean by a short distance?

A: Well, a half a mile or so.

Q: A half a mile?

A: Or a little over.

Q: All right; you went down the hill a half a mile before you applied your brakes, is that right?

A: Like I said, within a half a mile or so more, taking a rough guess."

Mr. Nemcek testified at the trial on behalf of himself and the bus company. He said he was the driver of the bus involved in the accident. As they were climbing up a mountainside there was a brief shower, but it remained cloudy and the roads were wet. He then described the events of the accident:

"Then as I proceeded over the top of the mountain, I started going downward, and traffic ahead of me was moving slowly and started slowing down and stopped. And then in an at-

tempt to stop, I applied the brakes on the bus, and when the bus started sliding, took my left foot—I done everything I could and went over the steering wheel to try to straighten the bus out which I did. As I went further on down, it seems like I hit an oil slick on the roadway. The road was oily and wet, and I applied the brakes the second time, and when I did this, the bus started sliding; and then I tried to straighten it out and I thought I had a chance, and going to the shoulder of the roadway. The brown car from the lane of traffic come over to the shoulder of the road and stopped at that point, and that's when I went over to the side of the road, to the shoulder, and tried to stop. The bus then went in the ditch, in the drain ditch."

He said that he was in the right lane, had the bus in the third of four forward speeds, and was doing approximately 33 miles per hour. Before he applied the brakes he was 140 to 160 feet behind the next car ahead of him. He said that after he got out of the bus he went up the road and saw oil slicks on the road 20 to 30 feet in diameter in about three different places. He said that coming down the hill he remained at about the same speed of 32 or 33 miles per hour. He could not account for the tachometer reading of 55.

In cross examination Mr. Nemcek said that as he came over the crest of the hill and around a slight bend, he had a clear view ahead for a distance from 1,500 feet to half a mile. He did not see the two car accident ahead because he was observing the immediate traffic moving ahead of him. He first applied his brakes when he noticed traffic about 160 feet ahead of him slowing down, and applied them again when the traffic ahead of him had stopped at about 120 feet away. He said that probably other traffic, ahead of the cars in front of him, had stopped because of the accident, but he did not see that because he was watching the traffic ahead of him as it

slowed down and stopped. He said he thought the right lane was open and that he could keep moving, until he saw the brake lights on the cars ahead of him. He also said that a brown car, several car lengths ahead of the car ahead of him in the right lane, moved over to the shoulder and stopped. After he got out of the bus he did not see the brown car.

After denying a defense motion for a directed verdict, Judge Proctor instructed the jury.[2] He explained that the defendants were required to exercise the highest degree of care for the safety of the passengers, to maintain a lookout, to maintain control over the vehicle, and to operate the bus at a speed that was reasonable and prudent under the conditions then present. He defined negligence and proximate cause. He instructed the jury that the bus company was responsible for any negligence of its employee, and that the plaintiffs were free of contributory negligence. He also told the jury that the mere happening of an accident raises no presumption of negligence on the part of anyone, and that the burden of proof, or persuasion, is upon a party asserting negligence to prove it by a fair preponderance of affirmative evidence.

At the conclusion of the instructions, appellants' counsel excepted "to the failure of the Court to grant the charge as to the applicability of res ipsa loquitur", and in lieu of requiring reasons to be stated, the court directed incorporation by reference of a trial memorandum

---

2. At the outset he said, "You are further instructed that the law of the State of New York governs this case, and that what I'm about to tell you concerning the law is the New York law * * *." It is settled that Maryland applies the *lex loci delicti* to tort cases. *Cook v. Pryor*, 251 Md. 41, 246 A. 2d 271; *White v. King*, 244 Md. 348, 223 A. 2d 763. But to invoke the benefits of foreign law a party must give the notice required by Code, Art. 35, §§ 47-50. *Parkside Terrace Apts. v. Lindner*, 252 Md. 271, 249 A. 2d 717; *Morris v. Peace*, 14 Md. App. 681, 288 A. 2d 600. No such notice was given by any of the parties in this case. In the absence of proof of the law of another jurisdiction it is presumed to be the same as the law of this State. *Hall v. Hall*, 238 Md. 191, 208 A. 2d 593. Only the law of Maryland was argued below, and briefed and argued here. We shall assume that the law of New York, if applicable, is the same as the Maryland law.

which had been filed on the law of *res ipsa loquitur* in Maryland. The instruction was not given.

We hold that Judge Proctor correctly declined to give a *res ipsa loquitur* instruction. We need not review again the excellent discussion of *res ipsa loquitur* in the opinion by Judge Finan for the Court of Appeals in *Blankenship v. Wagner*, 261 Md. 37, 273 A. 2d 412, nor the cases discussed there and in our later opinion in *Armstrong v. Johnson Motor Lines*, 12 Md. App. 492, 280 A. 2d 24.

For the purpose of the present case, *Blankenship* and *Armstrong* tell us that if the evidence, regardless of which side produces it, supplies the facts of what happened, leaving no unknowns, the jury has no need for "the aid of an inference to weigh the credibility of those facts, and to determine whether the facts which it accepts do or do not amount to negligence". *Armstrong, supra,* at page 499.

The accident and the events leading up to it were described to the jury through several different sources, direct and indirect, but the operator of the bus was the ultimate source of all of the relevant facts, except the tachograph disc readings, the physical description of the area and certain negative statements by the New York State Troopers. The evidence raised certain conflicts which may have required resolution, but it left no unknowns.

It is obvious that the bus left the highway because the operator steered it off the highway. It is obvious that he steered it off the highway to avoid colliding with one or more vehicles which had stopped in the lane ahead of him. Whether he was then forced from the shoulder to the ditch because another car unforseeably preempted the shoulder; whether the unforseeable presence of oil on the wet pavement deprived him of a capability to stop which he was reasonably entitled to rely upon; and whether the bus was being driven at 55 or 33 miles per hour immediately before the accident; all of these were questions to be resolved by the jury upon the actual or inferential conflicts in the evidence on those points.

Whether the bus operator was driving at a speed that was reasonable and prudent under the conditions then present and whether he was maintaining a lookout and maintaining control of the bus reasonably adequate to enable him to exercise the degree of care imposed upon him for the safety of his passengers, were questions to be answered by the jury from the known facts in evidence. There was no need to resort to inferences permitted by *res ipsa loquitur* to resolve unknowns.

*Judgments affirmed.*
*Appellants to pay costs.*