Ray ADKINS, et al.

v.

Donald DIRICKSON, et al.

Donald DIRICKSON, et al.

v.

Ray ADKINS, et al.

Civ. A. Nos. 78–3911, 79–0241.

United States District Court,
E. D. Pennsylvania.

Oct. 13, 1981.

Christopher C. Fallon, Jr., Cozen, Begier & O'Connor, Philadelphia, Pa., for Ray Adkins, et al.

Edward L. McCandless, Jr., Steinberg & Girsh, Philadelphia, Pa., for Donald Dirickson, et al.

## MEMORANDUM

GILES, District Judge.

Before me is defendants' motion for a new trial. For the reasons which follow the motion will be denied.

### I. BACKGROUND

Oncoming tractor trailers sideswiped in the dark of night. Neither driver recalled the impact. Nobody else witnessed the accident. The collision occurred on a portion of Interstate Route 78 ("I–78") which, because of construction, was a two-lane undivided highway. All traffic was routed onto the westbound section of the road, with westbound traffic restricted to what usually would be the outside driving lane, and eastbound traffic in the usual inside passing lane. Plaintiff[1] had been driving a box-type tractor-trailer westward in the outside lane. Defendant, who was driving east in a tanker tractor-trailer, loaded with a liquid, had been traveling in a four-lane section of I–78 and then went through a cross-over onto the two-lane section. The accident occurred approximately two-tenths of a mile after defendant made the cross-over. After trial, the jury found for plaintiffs. Defendants moved for a new trial.

---

1. "Plaintiff(s)" refers to the plaintiff(s) in Civil Action No. 78–3911: Ray Adkins, Charles Fletcher, and Lori Fletcher. "Defendant(s)" refers to the plaintiff(s) in Civil Action No. 79–0241: Donald Dirickson, Robert Coffman, and Union Carbide Corporation. The claims of Dirickson and Union Carbide in 79–0241 should have been raised in 78–3911 as mandatory counterclaims. (Plaintiffs, however, raised no objection to bringing these claims in a separate action.) Coffman, who was a passenger at the time of the accident, was not a defendant in 78–3911. Thus, he properly brought his claims in a separate action.

## II. NEW TRIAL MOTION

Defendants raise four grounds for a new trial: (A) admission of evidence derived from a tachograph as partial proof of the speed of defendants' truck; (B) preclusion of defense counsel's proposed method of attempting to recall or incorporate trial and deposition testimony by other witnesses; (C) refusal of a point for charge on Interstate Commerce Regulations, which were not introduced at trial; and (D) a verdict allegedly against the weight of the evidence.

To prevail on their motion, defendants must show not only that there was error, but also that any error was not harmless. *See* Fed.R.Civ.Pro. 61.

### A. *Tachograph Evidence*

The tachograph in question in this suit is a speed measuring and recording device. In essence, it is a recording speedometer. It consists of an ordinary speedometer connected to a recording device which charts on a circular graph, speed, distance travelled, and engine use.[2] As part of plaintiffs' case-in-chief, a tachograph chart was introduced, and an expert interpreted the chart as recording the speed of defendants' truck at impact as 41–42 miles per hour. Notes of Testimony, 3.80 [hereinafter cited as N.T.]. That expert, however, could not vouch that the tachograph had recorded accurately. *Id.* 3.98, 3.108–.110. Defendant timely objected to this testimony and asked that it be stricken. *Id.* 3.73, 3.98. The

objection was overruled. Defendants now raise this ruling as ground for a new trial.

Citing *Villegas v. Bryson*, 16 Ariz.App. 456, 494 P.2d 61 (1972), they argue that the proponent of tachograph evidence must lay a foundation by showing the accuracy of the particular tachograph.

At trial, defendants, characterizing the tachograph evidence as "scientific," argued that the proponent must show (1) general scientific acceptance, and (2) accuracy of the particular device. *See* J. Wigmore, *supra* note 2, at 450. *See generally* J. Richardson, *supra* note 2, § 9.2. In connection with this argument, it is important to note two points. First, the general scientific acceptance of the tachograph is not at issue in this case. If it were, I would take judicial notice of its acceptance. Second, if one accepts the rule proffered by defendants concerning the foundation required for "scientific" proof, then characterizing evidence as "scientific" puts the rabbit into the hat. Thus, the question whether evidence is "scientific" can be thought of as a different aspect of the question what foundation is required.[3]

Not only do plaintiffs challenge the proposition that the proponent of the use of the device must lay a foundation for its accuracy, but they also submit that there was indeed evidence of accuracy presented at the trial. These arguments, therefore, raise three questions for the court: (1) whether

2. Descriptions and photographs of tachographs may be found in Conrad, *The Tachograph As Evidence of Speed*, 8 Wayne L.Rev. 287, 288–91 (1962). On admission of tachograph evidence, see generally E. Fisher, *Legal Aspects of Speed Measurement Devices* 9–11 (1967); 3 S. Gard, *Jones on Evidence* § 15:16 (1972) [hereinafter cited as *Jones*]; McCormick on Evidence § 210, at 516 (E. Cleary ed. 1972) [hereinafter cited as *McCormick*]; 2 *Wigmore on Evidence* § 665a (Chadbourn rev. ed. 1970) [hereinafter cited as *Wigmore*]; Annot., 73 A.L.R.2d 1025 (1960). *See also* J. Richardson, *Modern Scientific Evidence* §§ 9.1–.14 (1974); A. Moenssens & F. Inbau, *Scientific Evidence in Criminal Cases*, § 13.01–.12 (2d ed. 1978); J. Wigmore, *The Science of Judicial Proof* §§ 220–232 (3d ed. 1937); Annot., 47 A.L.R.3d 822 (1973); Annot., 49 A.L.R.2d 469 (1956); Annot., 21 A.L. R.2d 1200 (1952).

3. *See* note 9 *infra*. In the post-trial motion papers, defendants have dropped this characterization.

Furthermore, both parties have obscured the issues by sometimes treating the issue as an expert-evidence problem under Fed.R.Evid. 702–703. This incorrectly describes the problem here. Plaintiff not only introduced expert testimony, but also the original tachograph chart, exhibit P–17, and two enlargements, one approximately four times larger than the original, P–21, the other approximately nine times larger. P–22. Also, if the expert's only role was interpretation of the chart (rather than an independent opinion of speed), *see* Plaintiffs' Memorandum 3–4, then it follows that if the chart was inadmissible, then expert interpretation was incompetent or irrelevant.

accuracy was a necessary foundation in this case; (2) if so, whether the foundation was laid; and (3) if a proper foundation did not exist, whether the error was harmless.

### 1. Accuracy As Part of Foundation

Is a showing of accuracy a prerequisite to introducing tachograph evidence, or does accuracy *vel non* merely go to the weight of the evidence? *See, e. g.*, *McCormick, supra* note 2, § 210, at 515; J. Wigmore, *supra* note 2, § 220, at 450. The few jurisdictions which have reached this question directly have held that the foundation for introduction of tachograph testimony must include a showing of "the accuracy of the particular tachograph which made the chart." *Villegas v. Bryson*, 16 Ariz.App. 456, 458, 494 P.2d 61, 63 (1972); *see Bell v. Kroger*, 230 Ark. 384, 386–87, 323 S.W.2d 424, 426 (1959); *Great Coastal Express, Inc. v. Schruefer*, 34 Md.App. 706, 714–16, 369 A.2d 118, 124–25 (1977) (quoting trial judge[4]); *Thompson v. Chicago & Eastern Illinois Railroad*, 32 Ill.App.2d 397, 405, 178 N.E.2d 151, 155 (1961); *Jones, supra* note 2, § 15:16, at 46; *McCormick, supra* note 2, § 210, at 516; *Conrad, supra* note 2, at 297. *Contra, Wigmore, supra* note 2, § 665a, at 917; *but see Hall v. Dexter Gas Co.*, 277 Ala. 360, 365, 170 So.2d 796, 800–01 (1964) (admissible on showing that it was ordinary business record); *but cf. NLRB v. Pacific Intermountain Express Co.*, 228 F.2d 170, 172 (8th Cir. 1955) (NLRB proceeding), *cert. denied*, 351 U.S. 952, 76 S.Ct. 850, 100 L.Ed. 1476 (1956); *People v. Dusing*, 5 N.Y.2d 126, 128, 155 N.E.2d 393, 394, 181 N.Y.S.2d 493, 495 (1959); *Nicholas v. Penny*, [1950] 2 K.B. 466, 473–74, (accuracy goes to weight of speedometer evidence), *quoted in People v. Dantonio*, 18 N.J. 570, 581, 115 A.2d 35, 41 (1955). *See also Bourn v. Department of Employment Security*, 134 Vt. 490, 365 A.2d 253 (1974) (in unemployment insurance case, employer carries risk of non-persuasion of accuracy of its tachographs).

None of these decisions, however, is controlling as to Pennsylvania law. Their precedential value depends on the persuasiveness of their logic. Examination of the cases does not disclose an explanation or rationale for their respective holdings. *See, e. g., Villegas*, 16 Ariz.App. at 458, 494 P.2d at 63 ("the law and common sense require"); *Great Coastal Express*, 34 Md.App. at 716, 369 A.2d at 124 (no reason given but quoted the trial judge who relied entirely on precedent from other jurisdictions); *Thompson*, 32 Ill.App.2d at 405, 178 N.E.2d at 155 (no reason); *Jones, supra* note 2, § 15:16, at 46 (no reason); *McCormick, supra* note 2, § 210 at 516 (merely relates majority rule; does not take independent view); *Conrad, supra* note 2, at 296 (unless showing of accuracy required "scientific proof of this nature becomes meaningless"; "common sense requires"). *But see Bell*, 323 S.W.2d at 426 ("because we are here dealing with a novel concept of evidence"); *Nicholas*, [1950] 2 K.B. at 473 (if very slight inaccuracy would make substantial difference in outcome, court may demand strict showing of accuracy); *id.* 474 (accuracy may be attacked effectively on cross-examination); *Wigmore, supra* note 2, § 665a at 917 (scientists customarily rely on statements of others whose accuracy is unchecked; unfeasible for professional to test every instrument himself). Thus, not finding the precedent from other jurisdictions enlightening or persuasive, I shall start my analysis from scratch.

■ The competence of possibly inaccurate tachograph recordings seems most analogous to the competence of possibly inaccurate witness observations. *See* J. Wigmore, *supra* note 2, § 220. Wigmore refers to this problem as "[p]erception by scientific process." *Id.* at 448. A witness is deemed competent to testify unless it is nearly impossible that he had first-hand observation. 3 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 602[02], at 602–5 (1978); *see* Fed.R.Evid. 601, 602. The quality of a witness's observations is not an issue for foundations; it is a matter for impeachment. *See, e. g., Wigmore, supra* note 2, § 658(b). By analogy, it would appear that the accuracy of a first-hand

---

4. The appellate decision consists almost entirely of a reproduction of the trial judge's opinion.

speed measurement is also a matter for impeachment.

Evidence based on scientific measurement may pose difficulties not presented by eyewitness testimony. In particular, a court must contemplate the possibility that the mere introduction of "scientific" or other metric evidence may create an impact upon the jury such that the evidence cannot be effectively impeached.

First, the measurement technique may be highly sophisticated in contrast to the simplified output of the device. Examples of such techniques might be neutron activation analysis or radar. The jury may readily understand the output, e. g., speed, but impeachment based on the measuring technique itself, e. g., the Doppler effect, may be disproportionately difficult to comprehend.

Second, the device may be used so infrequently that the range of accuracy may be totally outside a layman's experience. For instance, a juror may accept a radar speedgun reading of 50 m. p. h. as absolutely accurate, rather than accurate to plus or minus 5 m. p. h. Conversely, a normal fact trier reasonably may be expected to know that watches or commonly used instruments, like speedometers, are subject to some inaccuracy. Thus, even if a juror does not understand the inner workings of a watch, he will be receptive to evidence of inaccuracy. See J. Wigmore, supra note 2, § 220, at 450 (instruments such as telephone, thermometer, and theodolite, used commonly "without controversy or doubt" require no foundation).

Third, although based upon established techniques, the device may be so novel that its manufacturers have not yet ironed out all the wrinkles or its operators have not yet acquired the experience necessary for routinely accurate calibration. Thus, it would be unfair to accord any presumption that the device was accurate. In contrast, a watch manufacturer may be fairly presumed to make a reasonably accurate watch and to adjust it with reasonable accuracy before placing it on the market. Likewise, the average watch user may be presumed to set or reset the watch with reasonable accuracy. See id.

A fourth, related reason is that the measurement device may be delicate, subject to environmental influences, or otherwise require adjustment each time it is used. Examples might be a scientific balance, an electronic device which must constantly be recalibrated because of temperature or humidity changes, or a Prather Speed Device. See J. Richardson, supra note 2, § 9.3.

Fifth, a small degree of inaccuracy over a continuous range of calibration might make a vast, quantum difference in the quality of evidence. See J. Wigmore, supra note 2, § 220, at 450 (no foundation needed for certain instruments, especially "where no issue turns on minute accuracy.") For example, a miniscule difference in alignment of a voice spectrograph or neutron activation analyzer could change an expert's testimony on the identity of a voice or batch of chemicals. See generally A. Moenssens & F. Inbau, supra note 2, §§ 9.01–.10, 12.-01–.09.

Sixth, evidence which may be sufficiently reliable in a civil case may be suspect when introduced as proof beyond a reasonable doubt in a criminal case. See, e. g., People v. Dusing, 5 N.Y.2d 126, 128, 155 N.E.2d 393, 394, 181 N.Y.S.2d 493, 495 (1959) (untested radar or speedometer evidence is admissible, but insufficient to sustain speeding conviction); 75 Pa.Cons.Stat.Ann. § 3368 (evidence from untested speed-timing device is inadmissible in traffic prosecution).

Seventh, if the particular device is an official, government device and the authenticating testimony is from a government official, then the jury may be swayed disproportionately. This may be one reason that many jurisdictions have passed laws restricting evidence of speed-timing devices in criminal prosecutions. See, e. g., 75 Pa. Cons.Stat.Ann. § 3368 (Purdon 1975).

Eighth, the proponent of the measurement may have better control of evidence

of accuracy *vel non*.[5] (But federal discovery rules tend to eliminate any advantage on his part.) Finally, in every case, the court should be alert for any peculiarities of the device or technique involved.

Almost all of these factors weigh in favor of the general admission of tachograph evidence. First, a tachograph is a relatively unsophisticated device, working on the same mechanical principles as a speedometer. *See Conrad, supra* note 2, at 288; N.T. 4.120 (defendants' expert's testimony that "the tachograph is based upon simple concepts of velocity, time and distance"). Thus, a jury could comprehend impeachment of accuracy. For instance, in this case, defendants introduced comprehensible impeachment evidence relative to: resolution of problems due to thickness of the stylus blade, N.T. 3.87–.89; possibly incorrect calibration of the cable which drives the tachometer, *id.* 3.87–.89, .97–.98, .102–.103; driver tampering, *id.* 3.90–.92; incorrect zeroing of the speed recordings, *id.* 3.92–.93; and other alleged inaccuracies. *See, e. g., id.* 4.140–.143.

Second, although ordinary fact finders may be unfamiliar with the record portion of a tachograph, it is reasonable to expect them to be familiar with the speedometer portion, and to be receptive to evidence of inaccuracy. This expectation is especially reasonable when, as here, the evidence is that a tachograph works in the same way as a speedometer, *see id.* 3.66, and that the recording disk's accuracy correlates with that of the tachograph speedometer. *See id.* 3.75.

Third, even assuming that tachograph evidence was novel in 1959, *see Bell*, 323 S.W.2d at 426, it is by now old hat. In addition to the cases cited above, tachograph evidence has been accepted (without comment) in dozens of cases.[6] The principles used in the Sangamo tachograph in this case are exactly the same as those described for the Sangamo tachograph pictured in Conrad's 1953 article. *See Conrad, supra* note 2.

Fourth, the tachograph is a sturdy mechanical device which need not be recalibrated for each use. Fifth, both the tachograph's output and the expert's opinion embraced a continuous scale of speed. A small error in adjustment would result in a proportionate, rather than quantum, change in output. In fact, defendant's own expert used this principle in calculating a correction factor, *see* N.T. 4.146, which enabled him to use the tachograph to check his opinion.

All but one of the remaining factors weigh in favor of admissibility without foundation. The tachograph here was a private instrument, not backed by police

---

5. Note that the seventh and eighth factors vary from case to case. Thus they seem poor candidates for setting a general rule about tachographs. They may, however, justify an exception to the general rule.

6. *See, e. g., Edwards v. Mayes*, 385 F.2d 369 (4th Cir. 1967); *Grooms v. Minute-Maid*, 267 F.2d 541 (4th Cir. 1959); *Warren v. Pacific Intermountain Express Co.*, 183 Cal.App.2d 155, 6 Cal.Rptr. 824 (1960); *Smith v. American Mut. Liab. Ins. Co.*, 125 Ga.App. 273, 187 S.E.2d 299 (1972); *People v. Pittman*, 55 Ill.2d 39, 302 N.E.2d 7 (1973); *Kenney v. Churchill Truck Lines*, 6 Ill.App.3d 983, 286 N.E.2d 619 (1972); *Weishaar v. Canestrale*, 241 Md. 676, 217 A.2d 525 (1966); *Heiserman v. Baltimore & A. R.R.*, 15 Md.App. 657, 292 A.2d 140 (1972); *Hodges v. American Bakeries Co.*, 412 S.W.2d 157 (Mo.1967); *Dixon v. Cambell Sixty-Six Express, Inc.*, 321 S.W.2d 473 (Mo.1959); *State v. Dantonio*, 18 N.J. 570, 115 A.2d 35 (1955); *Tetreault v. State*, 50 Misc.2d 170, 269 N.Y.S.2d 812 (Ct.Cl.1966); *People v. Williams*, 23 Misc.2d 581, 196 N.Y.S.2d 790 (Sup.Ct.1960); *Benner v. Weaver*, 394 Pa. 503, 147 A.2d 388 (1959); *Tennessee Trailways, Inc. v. Ervin*, 222 Tenn. 523, 438 S.W.2d 733 (1969); *Sanchez v. Billings*, 481 S.W.2d 911 (Tex.Civ.App.1972); *Bourn v. Department of Employment Security*, 134 Vt. 490, 365 A.2d 253 (1976); *Western Packing Co. v. Visser*, 11 Wash.App. 149, 521 P.2d 939 (1974). *See also People v. Barbic*, 105 Ill.App.2d 360, 244 N.E.2d 626 (1969).

Tachograph evidence seems also routinely admitted in NLRB proceedings. *See, e. g., Buckley v. NLRB*, 432 F.2d 409 (9th Cir. 1970), *cert. denied*, 401 U.S. 1002, 91 S.Ct. 1246, 28 L.Ed.2d 535 (1971); *Illinois Ruan Transp. Co. v. NLRB*, 404 F.2d 274, 281–82 (8th Cir. 1968) (dissent); *NLRB v. Stafford Trucking, Inc.*, 371 F.2d 244 (7th Cir. 1966); *NLRB v. Pacific Intermountain Express Co.*, 228 F.2d 170 (8th Cir. 1955), *cert. denied*, 351 U.S. 952, 76 S.Ct. 850, 100 L.Ed. 1476 (1956).

testimony. This is a civil case, rather than a prosecution for a traffic violation.[7] Here, the opponent of the tachograph had control of the evidence.

One peculiarity of tachographs, however, weighs in favor of a foundation. The tachograph generally is not a piece of original equipment made by the truck manufacturer. The tachograph (of which Sangamo is the only major American manufacturer, N.T. 3.70), is installed separately, and replaces the normal speedometer. N.T. 3.66. Although Sangamo calibrates the instrument internally, *Id.* 3.89, accurate operation depends on receipt of proper input from the truck rotor cable. *Id.* 3.74–.75. If the rotor cable does not turn at the correct rate (1,000 turns per mile), a ratio adapter must be installed. *Id.* 3.90. There was no direct evidence that the rotor cable revolved at the proper rate.[8]

On balance, however, this peculiarity is not enough to outweigh the other factors. The most important of those are the first four: a tachograph operates on simple, understandable principles, removed from the frontiers of science; the range of accuracy of the key portion—the speedometer—is within the experience of most jurors; there is great experience in its manufacture, operation, and use as evidence; and by its nature, it does not require frequent adjustment. I therefore hold that, in this case, accuracy of the particular tachograph was a matter of impeachment going to the weight of the evidence, rather than a matter of foundation.[9] *See, e. g., NLRB v. Pacific Intermountain Express Co.,* 228 F.2d 170, 172 (8th Cir. 1955), *cert. denied,* 351 U.S. 952, 76 S.Ct. 850, 100 L.Ed. 1476 (1956); *People v. Dusing,* 5 N.Y.2d 126, 128, 155 N.E.2d 393, 394, 181 N.Y.S.2d 493, 495 (1959); *State v. Dantonio,* 18 N.J. 570, 580–81, 115 A.2d 35, 40–41 (1955); *Nicholas v. Penny,* [1950] 2 K.B. 466, 473–74.

## 2. Foundation in This Case

Because of the split of authority on the question whether a foundation is necessary, I shall also decide whether, if a foundation was required, it was laid in this case. I hold that it was not.

The substantial question as to accuracy of defendants' tachograph is that discussed above—was the rotor cable properly calibrated at 1000 r. p. m.? *See* text preceding note 8 *supra.* Plaintiffs had evidence showing reasonable accuracy on all other significant points. For instance, the tachograph was internally calibrated, N.T. 3.89; it had not been tampered with, *id.* 3.90–.92; and errors due to wear of the stylus blade or its moving off zero were resolved in defendants' favor. *Id.* 3.108. There was no testimony as to the calibration, no independent test of the tachograph, and no "proof line" test as in *Villegas. See* 16 Ariz.App. at 458, 494 P.2d at 63. Because accuracy depended on the correct alignment of the cable, and no significant competent evidence supported correct alignment, no foundation was laid for the accuracy of the particular instrument.

## 3. Harmless Error

Even if the tachograph testimony was admitted erroneously, it was harmless for three reasons. First, the impact speed measured by the tachograph is compatible with the impact speed propounded by defendants. *Compare* N.T. 3.80 (41–42 m.p.h. measured by tachograph), *with id.* 4.150 (32–45 m.p.h. estimated by defendants' expert). Second, plaintiff's expert, independent of the tachograph, reconstructed the speed at impact as 43–49 m.p.h. *Id.* 3.146. Thus, the tachograph output roughly corroborated independent evidence of speed

---

7. The proposition that 75 Pa.Cons.Stat.Ann. § 3368 applies to civil cases is demonstrably absurd. The result would be that a civil witness would be precluded from stating his speedometer reading unless he had tested speedometer 60 days before the reading.

8. But the tachograph expert testified a record of speed is important to truck owners, and that "[s]peed is [an] . . . integral part of . . . maintenance." N.T. 3.101.

9. This holding alternatively may be viewed as stating that a tachograph, like a speedometer, is insufficiently "scientific" to require the foundation usually needed for scientific evidence. *See* text at note 3 *supra.*

from two other sources. Finally, and most importantly, the impact speed was only tangentially relevant to the ultimate factual question—who was in the wrong lane. *See id.* 5.136.

█ This accident occurred only because one driver strayed out of his lane of traffic and onto the other side of the road. Under Pennsylvania law, driving on the wrong side of the road without an "excuse" is *per se* negligent. *Mihalic v. Texaco, Inc.*, 377 F.2d 978, 981 (3d Cir. 1967); *Matkevich v. Robertson*, 403 Pa. 200, 202–03, 169 A.2d 91, 93 (1961); *see Kenworthy v. Burghart*, 241 Pa.Super. 267, 277–82, 361 A.2d 335, 340–43 (1976), *appeal dismissed*, 478 Pa. 20, 385 A.2d 975 (1978).[10] In this case, each driver claimed the other was on the wrong side, and neither offered an "excuse." Thus, whoever was on the wrong side was negligent. At the request of both parties, I so instructed the jury, N.T. 6.25, without objection.

█ The significance of defendants' speed was secondary. It provided plaintiff with a theory of how defendants got to the wrong lane.[11] As defendants' counsel stated in conference, this is not "really a speed case. It's more a control of vehicle case." *Id.* 5.142. Thus, the theory is secondary, because as noted above, on the evidence in this case, negligence was established merely by showing that one driver was on the wrong side.[12] The tachograph evidence therefore had only tertiary significance. It

reinforced plaintiffs' expert's independent reconstruction of defendants' speed.

Because the parties had at best a dim recollection of the accident, and because there were no eyewitnesses, each side called an expert to try to reconstruct the accident. Defendants' expert, Dr. Batterman, opined that the accident happened in defendants' lane. N.T. 4.182. His opinion was based on examination and photographs of the damaged vehicles and the accident scene, especially gouge marks in the road. Based on the same kind of information, plaintiff's expert, Dr. Treitterer, reached the opposite conclusion. *Id.* 3.140, 3.140–.154. Thus, the case boiled down to which expert the jury believed.[13] Because neither expert relied on the tachograph chart, its effect on the ultimate factual issue was, at most, insignificant. Thus, if admission of the tachograph evidence was error, it was harmless.

## B. *Exclusion of Evidence*

█ Defendants also assign as error two refusals to permit questions and answers attempting to recall prior testimony. Defendants claim that it was erroneous to prevent their accident reconstruction expert from reading aloud six pages of plaintiff's deposition. Defendants' Memorandum of Law, at 2–3; *see* N.T. 4.178–.181. This was not error. First, Fed.R.Civ.Pro. 32(a)(4) precluded defendants from reading in only pages 20–26 (where plaintiff said the road was straight,) without also reading in page

---

**10.** *Kenworthy* also states that *Matkevich* was overruled in part on other grounds. 241 Pa.Super. at 281 n.8, 361 A.2d at 342 n.8.

**11.** The speed limit at the cross-over was 30–35 m.p.h. N.T. 2.33. The tachograph chart recorded the speed as over the limit, N.T. 3.80 (41–42 m.p.h.), while defendant's expert's estimate overlapped the limit. N.T. 4.150 (32–45 m.p.h.).

**12.** In Pennsylvania, driving faster than the speed limit is not negligent unless speed is also a proximate cause of the accident. *Rhoads v. Ford Motor Co.*, 514 F.2d 931, 935 (3d Cir. 1975). Thus speed was not negligent unless it caused defendant to be in the wrong lane, which was negligent anyway. Had speed been the primary underlying negligence, the tachograph evidence might have had greater impact.

**13.** There are many reasons why the jury properly could credit plaintiffs' expert. There were differences in the quality of the information the experts relied on, as well as different demeanors during testimony. Three other items stood out at trial. First, the experts' qualifications differed significantly. Second, the qualifications of plaintiffs' expert were unquestioned, N.T. 3.136, while defendants' expert was subject to serious cross-examination on his qualifications. *Id.* 4.124–.133. Third, by testifying that defendants' tanker-trailer "definitely should be" baffled to control stability, *id.* 4.209, defendants' expert supported plaintiffs' argument that lack of baffling was negligent and a cause of lack of control preceding the accident.

37, (where plaintiff said the road curved slightly and was "practically straight to a professional driver"). *See* N.T. 4.220. It was within the court's discretion to insist that the deposition be as though the witness were then present and testifying. *See* Fed. R.Civ.Pro. 32(a); Fed.R.Evid. 611(a). Finally, I cannot understand how the ruling could have been prejudicial; defendant could have, but did not choose to, interrupt the expert's testimony in order to read in the deposition. N.T. 4.181. In any event, the six pages were admitted and read to the jury. *Id.* 4.214–.220.

■ Second, defendants claim that the court erroneously refused to permit questioning of defendants' expert concerning the percentage error in the tachograph recording of mileage.[14] Defendants' Memorandum of Law, at 3–4; *see* N.T. 4.141–.146. Objections to the questions were sustained because they attempted to recall testimony, *id.* 4.141–.142, .145. The court's eventual ruling, however, allowed defendants to pose assumptions "without stating or suggesting that those assumptions are founded in testimony." *Id.* 4.145. Defendants never did so. It was not error to require that questions be posed without introduction of hearsay in the form of attempted recollection of testimony of a non-party. Furthermore, even if erroneous, I cannot perceive, and defendants do not explain,[15] why such a restriction in the form of question was prejudicial.

### C. *Point for Charge*

■ Defendants argue that the court erroneously refused their point for charge number four. Defendants' Memorandum of Law, at 4; *see* N.T. 5.146. This charge consisted of large portions of ICC regulations, 49 C.F.R. §§ 392.3, 395.2, 395.3 (1980); a statement that the evidence showed that plaintiff had violated the regulations and an instruction that if the jury found that violation of regulations was the proximate cause, the jury must find plaintiff negligent.[16] This instruction was refused. It usurped the jury's role as fact finder by stating that the evidence showed a violation. Also, it is not clear to me that the evidence would allow the jury to find that plaintiff had been "on duty" for fifteen hours. *See* 49 C.F.R. §§ 395.2(a), 395.-3(a)(2). Furthermore, I viewed the subject matter of the regulation (limiting the number of hours a driver may be on duty) as more properly a matter for argument to the jury. N.T. 5.146. Defendants' contention, which they were permitted to argue, was that as a result of being on duty so long, plaintiff fell asleep at the wheel.

■ It was not error to refuse this instruction. Pennsylvania law does not support the contention that such a charge is mandatory. In the only case involving this instruction, *Ridley v. Boyer*, 426 Pa. 28, 31–32, 231 A.2d 307, 308–09 (1967), the Pennsylvania Supreme Court held merely that such a charge was not erroneous. *Id.* at 32, 231 A.2d at 309 ("The court was on the highway of proper instruction, when it spoke thus.") (Musmanno, J.). In any event, refusal was not prejudicial. Defendants were allowed to argue this issue to the jury as a matter of fact. Indeed, defendants were not precluded from introducing and explaining the regulation in the trial or thereafter, arguing the regulation to the jury.[17] Most important, the issue whether

---

14. Because mileage error is proportional to speed error, *see* N.T. 3.100, the expert then would have applied that percentage to calculate the alleged error in the speed recording.

15. Indeed, Defendants' Memorandum contains no citation of the transcribed record. This has made all of the motion more difficult to deal with.

16. The proposed charge is contained in the record only in plaintiffs' answer to the new-trial motion. (Plaintiffs have accurately reproduced the proposed charge submitted to me.) Defendants' quotation of 49 C.F.R. § 395.2 erroneously omitted paragraph (a)(4). This would have been noted if defendants had asked me to take notice of the regulation. They never did so. *See* Fed.R.Evid. 201.

17. The transcript filed by defendants omits both opening and closing argument. Counsel, however, is required to file a transcript of the entire trial, *see* E.D.Pa.R.Civ.Pro. 20(e). I

the regulations were violated is only tangentially related to the ultimate issue of where the accident occurred. *See* part II. A.3. *supra.*

### D. *Verdict Against Weight of Evidence*

Finally, defendants argue that the verdict was against the weight of the evidence because plaintiffs' expert's reconstruction of the accident conflicted directly with plaintiff's version. I perceive no such conflict. For the reasons given in plaintiffs' memorandum, the expert's reconstruction of the accident is compatible with plaintiff's testimony.

For the above reasons, defendants' motion for a new trial must be denied.

therefore deem the omission to be a waiver of any argument in support of the motion based on remarks that counsel made or failed to make at opening or closing.